Heath KENNEDY *v.* STATE of Arkansas

CR 95-711                                      923 S.W.2d 274

Supreme Court of Arkansas
Opinion delivered June 3, 1996

*Didi Sallings*, Executive Director, Arkansas Public Defender Commission, by: *Elizabeth S. Johnston*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Deputy Att'y Gen., Sr. Appellate Advocate for appellee.

DAVID NEWBERN, Justice. Heath Kennedy stands convicted of capital murder and sentenced to life imprisonment without parole. He argues that the evidence was insufficient to have been permitted to go to the jury, thus his motion for directed verdict should have been granted. He also contends a statement given by him to the

police should have been suppressed. We affirm the conviction because the evidence was not only sufficient but overwhelming, and the State has shown that the statement was knowingly and voluntarily given.

Testimony at the trial revealed these undisputed facts. On March 5, 1994, Heath Kennedy, age 18, and Wade Miller, age 16, entered the Subway Sandwich Shop in El Dorado. Mr. Miller produced a .25-caliber pistol and pointed it at the cashier, who was the only employee in the store. The cash register was emptied and the cashier, 21-year-old Leona Cameron, was shot twice in the head. The shooting was done by Mr. Miller who had gone over the counter and taken Ms. Cameron to the storage area in the rear of the store. After killing Ms. Cameron, Mr. Miller called Mr. Kennedy to the rear of the store. He was having trouble getting the video tape out of the video cassette recorder (VCR) which was connected to the store security camera. The two young men left the store with the VCR which they dumped in a "mud hole" at Calion. Although the VCR and the tape it contained had been under water for days, still pictures taken from the tape after enhancement by the FBI clearly showed the young men in the store at 9:52 p.m. on the night of the murder.

### 1. Sufficiency of the evidence

Arkansas Code Ann. § 5-10-101 (Repl. 1993) provides in part:

(a) A person commits capital murder if:

(1) Acting alone or with one (1) or more other persons, he commits or attempts to commit ... robbery, ... and in the course of and in furtherance of the felony, or in immediate flight therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life; or

\*\*\*

(4) With the premeditated and deliberated purpose of causing the death of another person, he causes the death of any person;

\*\*\*

(b) It is an affirmative defense to any prosecution under subdivision (a)(1) of this section for an offense in which the

defendant was not the only participant that the defendant did not commit the homicidal act or in any way solicit, command, induce, procure, counsel, or aid in its commission.

As Mr. Kennedy did not do the shooting, his argument is that his responsibility could only be that of an accomplice. Arkansas Code Ann. § 5-2-403(a) (Repl. 1993) provides:

A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of an offense, he:

(1) Solicits, advises, encourages, or coerces the other person in planning or committing it; or

(2) Aids, agrees to aid, or attempts to aid the other person in planning or committing it; or

(3) Having a legal duty to prevent the commission of the offense, fails to make proper effort to do so.

In the statement he gave to the El Dorado police, Mr. Kennedy said he did not know Mr. Miller had the pistol in his possession when they entered the store and that he protested strongly when Mr. Miller pulled it out and pointed it at Ms. Cameron. There is, however, strong evidence that Mr. Kennedy did know the gun would be used and that he helped plan and execute the robbery and murder and thus was an accomplice.

Ricky Church testified he saw Mr. Kennedy give the gun to Wade Miller, and was with Mr. Kennedy when he attempted to purchase ammunition for the gun. Darla Chance, a firearms dealer, stated that Mr. Kennedy purchased a magazine for the pistol several months prior to the murder. She also corroborated the testimony of Mr. Church that Mr. Kennedy attempted to purchase ammunition from her on March 4, 1994, the day before the murder. As he was under 21, he was not allowed to purchase the ammunition.

David Crawford testified that Mr. Kennedy asked him to purchase a box of .25-caliber ammunition. He stated that Mr. Kennedy drove him to Wal-Mart where he bought the shells for Mr. Kennedy the day before the shooting.

John Bennefield testified he saw Mr. Miller and Mr. Kennedy with the pistol on the evening of the murder. He stated that he saw

Mr. Miller "wiping down shells with a rag in his lap." According to Mr. Bennefield, when he asked them what they were going to do he was told, "Don't worry about it."

Jason Jackson told the jury he saw Mr. Kennedy and Mr. Miller about 8:00 p.m. on the night of the murder. According to his testimony, they brought up the idea of robbing a store and asked him if he would like to be the getaway driver for them. Mr. Jackson testified they told him they got the idea from the movie, *Menace II Society*, which, in the opening scene, depicts the robbery of a store, the killing of the cashier, and the removal of the videotape. Mr. Jackson testified the two told him they were going to rob the Subway Sandwich Shop because it would not be very crowded.

Mr. Jackson further testified that he saw Mr. Kennedy the day after the murder and that Mr. Kennedy showed him a newspaper reporting the crime and told him that he and Wade Miller had done it. Mr. Kennedy told him they went to the store but people were there. When they returned about ten minutes later, Wade pulled his gun, and demanded the money. Mr. Jackson stated that Mr. Kennedy said he grabbed the money while Miller took the young woman to the back. Mr. Kennedy told Jason that he heard three shots, then, after the fourth shot, he heard the victim scream, "Oh God." He then went to the back room and helped get the VCR.

A defendant may properly be found guilty not only of his own conduct, but also the conduct of his accomplice. *Purifoy v. State,* 307 Ark. 482, 822 S.W.2d 374 (1991). When two or more persons assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both. *Parker v. State*, 265 Ark. 315, 578 S.W.2d 206 (1979). There is no distinction between principals on the one hand and accomplices on the other, insofar as criminal liability is concerned. *Purifoy v. State, supra.*

In view of the testimony showing that Mr. Kennedy participated in the planning of the robbery and murder, including his purchase of ammunition for the pistol used by Mr. Miller, his presence at the scene during the commission of the crime, his participation in attempting to dispose of the VCR after the shooting, and his admission to a friend of having committed the crime, we conclude it was not error to allow the jury to consider the evidence against Mr. Kennedy.

## 2. Involuntary statement

Mr. Kennedy moved to suppress evidence of an inculpatory statement he made to Lt. Carolyn Dykes and Detective James Morrow of the El Dorado Police Department. At a hearing on the motion, the testimony of the officers revealed the following.

Detective Morrow had once been married to an aunt of Mr. Kennedy and had close ties with the Kennedy family until he and the aunt were divorced some five years ago. He had, during the time of that marriage, been Heath Kennedy's baseball coach as well. On Monday, March 7, 1994, Detective Morrow went with another officer to the Kennedy home to speak to Heath Kennedy about the disappearance of Joe Johnson, about information that Mr. Kennedy had been seen with a gun, and about the Subway store murder. Mr. Kennedy denied knowledge of any of the three.

On March 8, 1994, Detective Morrow called Mr. Kennedy and asked if he could come to the police station to discuss the disappearance of Joe Johnson and bring Wade Miller with him. Mr. Kennedy agreed. Shortly thereafter, Mr. Kennedy's mother called Detective Morrow to ask what was going on. Detective Morrow told her he was having a group of young people come in to discuss Joe Johnson's disappearance. He did not mention the Subway robbery and homicide.

Mrs. Kennedy arrived at the police station with Heath and Wade Miller late the afternoon of March 8, 1994. She and Heath were taken to a room by Lt. Dykes. Detective Morrow was present. Lt. Dykes had learned of Detective Morrow's previous family relationship with the Kennedys and had informed her superior that she would take the lead in the interview. She presented Heath Kennedy a waiver of rights form which stated the interview was to be about the homicide at the Subway store and the missing juvenile, Joe Johnson. The form had a place for the person executing it to state his date of birth. When Heath Kennedy informed Lt. Dykes of his date of birth, indicating that he was 18 years old, Lt. Dykes asked Mrs. Kennedy to leave the room. Mrs. Kennedy objected. She testified Lt. Dykes told her the law required that she leave. Mrs. Kennedy went into the hallway and was then asked to move further away, which she did.

Heath Kennedy admitted that he had a gun and had been with Wade Miller on the night of the murder. He denied knowledge of

Joe Johnson's disappearance and of the Subway robbery and the murder of Ms. Cameron. Lt. Dykes testified she assumed there was no further information to be obtained from him at that time, so she left the room to report that fact to her superior. At that point, Detective Morrow told Mr. Kennedy it would break his parents' hearts to learn that he was running around with a gun. Shortly thereafter, Mr. Kennedy asked if he could tell Detective Morrow something and have his "name kept out of it." Morrow replied he could make no promises, but asked, "What's on your mind?" Heath Kennedy then, according to Detective Morrow, admitted "his complicity or his part in the Subway incident." Lt. Dykes returned to the room and took a full statement from him in which he gave the details of the robbery, the shooting, and the attempt to dispose of the VCR, but said he did not know Miller had the gun and that he urged him not to use it.

Mr. Kennedy makes no claim that he was in any way coerced into making his statement to the police. His argument is that his statement should have been suppressed because of the "underhanded and deceitful" conduct on the part of a man he knew as "Uncle Jamie" and trusted to treat his statement as confidential. There is a suggestion that, had Mrs. Kennedy not been lied to about the nature of the investigation, she would not have permitted Heath to go to the police station without an attorney. He claims the VCR and the tape it contained as well as the gun recovered from beneath Wade Miller's grandparents' front porch should have been suppressed as fruit of the poisonous tree.

The State has the burden of proving by a preponderance of the evidence that a custodial confession or inculpatory statement was given voluntarily, and was knowingly and intelligently made. *Phillips* v. *State*, 321 Ark. 160, 900 S.W.2d 526 (1995). Consideration of the validity of a criminal defendant's waiver of the right to remain silent and the right to counsel prior to giving an inculpatory statement may be divided into two components. *Clay* v. *State*, 318 Ark. 122, 883 S.W.2d 822 (1994). The first component is the voluntariness of the waiver, and it concerns whether the accused has made a free choice, uncoerced by the police, to waive his rights. The second component involves whether the defendant made the waiver knowingly and intelligently, and the inquiry then focuses on determining if the waiver was made with a full awareness of both the nature of the right being abandoned and the conse-

quences of the decision to abandon it. *Id.* We must also decide if the confession or inculpatory statement, given after a waiver of rights has occurred, was itself voluntarily made.

When reviewing the voluntariness of confessions, we make an independent determination based on the totality of the circumstances and reverse the trial court only if its decision was clearly erroneous. *Oliver* v. *State,* 322 Ark. 8, 907 S.W.2d 706 (1995); *Rucker* v. *State,* 320 Ark. 643, 899 S.W.2d 447 (1995). In determining whether a confession was voluntary, the Court considers the following factors: age, education, and intelligence of the accused, lack of advice as to his constitutional rights, length of detention, repeated and prolonged nature of questioning, or the use of physical punishment. *Smith* v. *State,* 286 Ark. 247, 691 S.W.2d 154 (1985); *Barnes* v. *State,* 281 Ark. 489, 665 S.W.2d 263 (1984). Two other pertinent factors in considering the totality of the circumstances are the statements made by the interrogating officer and the vulnerability of the defendant. *Oliver* v. *State, supra*; *Free* v. *State,* 293 Ark. 65, 732 S.W.2d 452 (1987).

As Mr. Kennedy does not claim that the officers threatened him or induced him with promises of leniency, or that there was an unduly long or otherwise oppressive interrogation, the voluntariness of the statement hinges on his claim of vulnerability. Mr. Kennedy's claim of vulnerability is based primarily on his youth, his relationship of trust with Detective Morrow, and the fact that he and his mother were misled initially as to the scope of the interview in which he ultimately inculpated himself.

Although youth is a factor, it alone is not a sufficient reason to exclude a confession. *Misskelley* v. *State,* 323 Ark. 449, 915 S.W.2d 702 (1996); *Oliver* v. *State, supra.* Mr. Kennedy was over eighteen years of age, thus his mother's consent was not required for a waiver of his right to counsel. Ark. Code Ann. § 9-27-317 (Repl. 1993).

The only authority cited by Mr. Kennedy in support of his argument on this point consists of *Free* v. *State, supra,* and *Davis v. State,* 275 Ark. 264, 630 S.W.2d 1 (1982). Those cases recite the general law on voluntariness but do not help with the facts of this case. *Wong Sun* v. *United States,* 371 U.S. 471 (1963), is cited for the "fruit of the poisonous tree" doctrine regarding the VCR and the gun.

For the proposition that the police "may make misrepresentations of fact so long as the officer does not coerce the suspect and does not make promises of leniency, so long as the suspect's incustodial statement is otherwise freely and voluntarily made, with the suspect having been previously informed of his so-called *Miranda* rights," the State cites *Gardner* v. *State,* 263 Ark. 739, 569 S.W.2d 74 (1978), *cert. denied* 440 U.S. 911 (1979), and *Tucker* v. *State,* 261 Ark. 505, 549 S.W.2d 285 (1977).

In the *Gardner* case, we held there was no error in admitting evidence of an inculpatory statement when there was a factual dispute of whether the defendant and his father had been misled by police officers about whether the statement could be withdrawn if he later obtained an attorney. Here we have no factual dispute about whether Mrs. Kennedy and Heath Kennedy were misled or the degree to which they were misled.

More relevant is the *Tucker* case, in which there was evidence that a police officer had led the 16-year-old defendant to believe physical evidence that he had killed his mother was stronger than it was. The officer went so far as to refer to the misleading as a "ruse" and a "con." There was also evidence that the officer had become a "dutch uncle" to the defendant. In our opinion holding these facts did not make the statement involuntary we cited *Frazier* v. *Cupp,* 394 U.S. 731 (1969). There the Supreme Court dealt with a case in which a defendant was falsely told by an interrogator that another had confessed that he and the defendant had committed a crime. The interrogator further misled the defendant when the defendant suggested he might get in more trouble if he said more without a lawyer's guidance. The interrogator misled him by saying that he could not be in any more trouble than he was already. The Supreme Court held the misrepresentation about the confession was relevant but not sufficient to make an otherwise voluntary confession inadmissible.

In this case, there is no question Mr. Kennedy was of age and waived his rights after being informed the investigation was about not only the disappearance of Joe Johnson but the homicide of Ms. Cameron as well. Although Mr. Kennedy was described at one point as mildly retarded in connection with an academic evaluation, he was in the eleventh grade and could read and write.

There is no suggestion that Mr. Kennedy did not understand

his situation. There were no threats of violence or promises of leniency. He had been asked about possession of a pistol on the day before he went in for questioning; thus, he shouldn't have been too surprised when that topic arose. He was questioned for less than two hours. There is no suggestion that he asked to be represented by an attorney. His inculpatory statement was made at his own instance after it appeared that his interview at the police station would end with his denials. Given these circumstances, we cannot say the statement was involuntary.

▮ The totality of the circumstances surrounding the taking of the confession in this case is such that we cannot say the Trial Court erred in admitting evidence of the statement. The Trial Court was entitled to rely on the testimony of Detective Morrow that the statement was volunteered without prompting. *Everett* v. *State*, 316 Ark. 213, 871 S.W.2d 568 (1994).

### 3. Rule 4-3(h)

In accordance with Arkansas Supreme Court Rule 4-3(h), the record of trial has been examined for rulings adverse to the defendant on objections, motions, and requests by either party, and we find no reversible error.

Affirmed.

DUDLEY, J., not participating.