Marcus HOOD *v.* STATE of Arkansas

CR 96-103                                        947 S.W.2d 328

Supreme Court of Arkansas
Opinion delivered June 9, 1997

*Michael D. Ray*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Todd L. Newton*, Asst. Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. After a jury trial, the appellant was convicted of aggravated robbery, and sentenced to fifty years' imprisonment. The appellant raises four points for reversal. We affirm.

On January 4, 1994, Hamburg police officer Danny Ray Smith received a call concerning an alleged armed robbery that took place at a service station. Officer Smith found that one of the gas station's proprietors, Shorty Williamson, had been shot. Another man at the scene, Leroy Harris, provided Officer Smith with a description of a vehicle at the scene, "a small new model, new looking model green car with heavy dark-tinted windows."

Leroy Harris had gone to the Williamson service station to get some gas. While walking inside to pay, he saw a person walking out of the station whom he later identified as Cedric Dunn. While inside, Harris saw Williamson bent over. Harris then went back outside and noticed a small, green car with tinted windows parked at the back of the station. The car subsequently left and headed south. Harris did not see who was in the car, nor did he see Dunn actually enter the car.

At trial, Hood's friend, David Haynes, recalled that shortly before January 4, 1994, Hood went along with him to a field to shoot a chrome .357 Smith & Wesson, with a black, rubber-grip handle. After Haynes finished firing the gun, he said that he left it in Hood's car, which he described as a small "light green-looking Honda." Haynes did not see Hood again, but found out the next day that Hood was in jail. On cross examination, Haynes explained that he put the gun under the car seat while Hood was outside of the car, and that he did not know if Hood saw him put the gun under the seat. Haynes likewise never told Hood the gun was under the seat.

Cedric Dunn pled guilty to aggravated robbery and theft of property in relation to the Shorty Williamson shooting, and was sentenced to twenty years. Hood was married to Dunn's aunt,

and the two had known each other for eight or nine months prior to the robbery. Dunn testified that Hood came to him and "said we was going to go and rob Mr. Williamson." He said that he rode with Hood, who was driving his aunt's car, to Shorty Williamson's gas station. Dunn testified that Hood parked the car and followed Dunn into the gas station, but then Hood "seen somebody and left." According to Dunn, he pointed a gun at Williamson, who in turn struck at the gun, causing it to discharge. Williamson fell to the floor, and Dunn took some money from Williamson's pocket and ran. Dunn further testified that the gun was a "chrome, black handle .357," with a rubber handle, that he obtained from Hood. Hood had told Dunn that he was holding the gun for a friend. After the shooting, Dunn said that he went back to Hood's car and Hood drove him back to his home in Wilmot. While they were leaving, Dunn saw Leroy Harris pulling into the gas station. Dunn added that he gave Hood the money and the gun, and that Hood said he would hide the gun and they would split up the money later.

Joe Tullos was a captain with the Ashley County Sheriff's Reserve Department. On January 4, 1994, he received a radio dispatch about a "teal-green small import" that was involved in an armed robbery in Hamburg. That morning, Tullos encountered a vehicle matching the description about a mile and a half east of Wilmot. He observed the vehicle turn into the Wilmot city dump off of Highway 52. He waited for about three minutes, and then saw the vehicle pull out of the dump and continue down the highway. After following the vehicle for three miles, he pulled the vehicle over. He then arrested Hood, the only occupant of the vehicle. After Wilmot chief of police Glen Lawson arrived on the scene and advised Hood of his *Miranda* rights, Hood made the following statement: "Man, I never got out of the car over there."

Officers William Setterman and David Oliver aided in the investigation of the robbery. During an interrogation, Hood volunteered to take them to the sight where he disposed of the gun. Hood took Setterman, along with Hamburg chief of police David Sims, to the dumpsters east of Wilmot, off of a gravel road. In a grassy area Sims recovered a chrome .357 revolver. The revolver contained one spent shell casing with five live rounds.

Hood was charged with theft of property and aggravated robbery. The trial court granted Hood's directed verdict motion with respect to the theft of property charge. However, the jury ultimately convicted Hood for aggravated robbery, and sentenced him to fifty years' imprisonment.

### 1. Sufficiency of the evidence.

Hood challenges the sufficiency of the evidence to support his conviction for aggravated robbery. The State does not address the merits of his argument, but responds that the issue is not preserved for appellate review because Hood failed to abstract the trial court's ruling on the renewal of his directed verdict motion. We agree. At the close of the State's case, Hood's abstract shows that he made a specific directed-verdict motion on the aggravated robbery charge alleging that there was insufficient evidence of corroboration. The abstract also reflects that the trial court found that there was sufficient evidence of corroboration to give the case to the jury. Following the close of all evidence, Hood made a general renewal of "all earlier motions," and the abstract demonstrates that closing arguments were then made.

While Hood's abstract contains his general renewal of the earlier, specific directed-verdict motion, see *Durham v. State*, 320 Ark. 689, 899 S.W.2d 470 (1995) (renewed directed-verdict motion "I would renew all previous motions I have made" at close of evidence sufficient for appellate review), it fatally omits the trial court's ruling on this motion. This court has often emphasized that the record on appeal is limited to that which is properly abstracted. *See, e.g. Moncrief v. State*, 325 Ark. 173, 925 S.W.2d 776 (1996). Without the trial court's ruling, we have no basis for a decision, and are precluded from a review of this point. *See Danzie v. State*, 326 Ark. 34, 930 S.W.2d 310 (1996); *Donald v. State*, 310 Ark. 197, 833 S.W.2d 770 (1992).

### 2. Sufficiency of the transcript.

Hood argues that the record in the case is inadequate for purposes of appellate review. Hood originally filed a motion to supplement the transcript, arguing that the record omitted a February

7, 1995, suppression hearing and a bench conference at trial regarding Hood's objection to the State's question to Setterman, "[W]here you or did you recover anything of evidentiary value in the investigation of Shorty Williamson's Service Station in Hamburg?" *See Hood v. State*, 324 Ark. 457, 920 S.W.2d 853 (1996) (per curiam). We granted the motion to supplement and remanded to reconstruct and settle the record. *Id.* We noted the resolvable nature of the omissions involved, and observed that even if a transcript of the proceedings could not be made, the record could nonetheless be settled pursuant to Ark. R. App. P.— Civ. 6. *Id.*

On June 6, 1996, the trial court held a hearing to reconstruct the record. Apparently, the court reporter who made the original record of the case, Val Dixon-Sims, failed to produce certain tapes, thus making it impossible to transcribe certain portions of pretrial hearings and a bench conference. When the initial transcript was received from Dixon-Sims, it contained none of the pretrial hearings. On remand, court reporter Margaret Norton was able to use existing tapes to prepare a partial transcript of a majority of the pretrial hearings, but there were no tapes at all of a particular suppression hearing, and the audio quality of the bench conference was inadequate.

Defense counsel explained at the June 6, 1996, hearing that the bench conference concerned the trial court's previous failure to rule on his motion to suppress. Because the trial court had not yet issued a formal ruling on the motion, defense counsel was concerned as to whether Setterman would be able to testify to the circumstances surrounding the recovery of the gun, given that it was the fruit of an allegedly coerced statement. Defense counsel further opined that "the Court must have overruled my objection. . . because the witness then went ahead and began testifying to where they went and what they got and what they did. That appears to me to be what happened at that bench conference." The prosecutor likewise stipulated to this version of events at the bench conference.

On June 24, 1996, a supplemental record was filed with this court containing a transcription of multiple pretrial hearings along

with the June 6, 1996, reconstruction hearing. On October 21, 1996, the State filed a motion to remand with this court arguing that while the record had been settled with respect to the June 20, 1995, bench conference, it had not been settled with respect to the suppression hearing testimony of Officers Oliver and Tommy Breedlove. We granted the motion, and the trial court held another reconstruction hearing on December 4, 1996. At this hearing, defense counsel explained that tape-recorded interviews were taken from Hood on January 4, 5, and 6, 1994. According to defense counsel's recollection, the tapes of the interviews showed that Hood was ill at the time of the statements, as indicated by Hood's constant coughing on the tapes. Defense counsel also recalled that the police used profanity, derogatory statements, and manipulation to obtain the statements.

The remainder of the December 4, 1996, hearing focused on the reconstruction of Breedlove's and Oliver's testimony regarding their interview with Hood on January 4, 1994. This testimony was apparently given originally at the February 7, 1995, suppression hearing. Both the prosecutor and defense counsel attempted to recollect the questions and answers asked of Breedlove. Breedlove was also called as a witness and asked questions regarding his recollection of his testimony at the suppression hearing. The prosecutor then read a transcript of Hood's January 4, 1994, interview prepared by defense counsel for the suppression hearing. Both the parties informed the trial court that this was an accurate recitation of the testimony adduced at the suppression hearing.

According to defense counsel, the only matter left unresolved was Officer Oliver's statement that he was attempting to intimidate Hood during the interview. The prosecutor responded that Oliver did admit that he was trying to intimidate Hood, as well as that he had made misrepresentations to Hood regarding statements Dunn had made. Defense counsel then replied "that's an accurate recitation of what happened at the suppression hearing, Your honor, in its entirety, I think." The trial court suggested that Officer Oliver be called as the next witness at the reconstruction hearing, to which defense counsel responded that it would be unnecessary to call Oliver, given the prosecution's stipulation to

the "intimidation" testimony. Subsequently, the trial court again inquired whether Oliver's testimony was necessary, and defense counsel responded:

> Your honor, I think the prosecutor and I agreed to what occurred, what was said, what we've read into the record. So I, it surprised me, I didn't think we would be, but I don't believe we'll have to put him on the stand and question him because I believe we stipulated to what he said. The arguments that were made to the Court I think have been recreated. So I don't see any need to put him on the stand and question him, Your Honor.

■ On direct review, Hood now claims that the record is insufficient for our review. He first contends that the exact dates of the three suppression hearings are unknown. This is not the case. The first supplemental transcript shows that a suppression hearing was held on February 3, 1995, where Officers Sims and Setterman testified. The first supplemental transcript also shows that a suppression hearing was held on May 15, 1995, where Charlotte Tadlock testified to Hood's health and physical condition when he was being interrogated in January. Hood also testified at this May 15, 1995, hearing. Both parties agree that there was another suppression hearing where Oliver and Breedlove testified, and that it occurred between the February 3 and May 15 hearings. While the parties never technically settled when this hearing occurred, the weight of the evidence suggests it was held on February 7, 1995.

■ ■ Hood also complains that the reconstruction hearings lack substance. Again, this argument is without merit. The two supplemental transcripts total almost one-hundred fifty pages and transcribe at least in part all of the missing pretrial hearings, except for the second suppression hearing where Breedlove and Oliver testified. Moreover, the parties agreed that the December 4, 1996, reconstruction hearing adequately established the testimony from the missing suppression hearing. Thus, the record is sufficient to allow this court to review the voluntariness of Hood's statement. Hood also argues that the record is insufficient because it lacks a transcript of the bench conference on Hood's objection to Setterman's testimony. However, at the June 6, 1996, reconstruction hearing, the parties agreed that the subject of the bench

conference was the lack of a ruling on the motion to suppress, which motion was ultimately denied.

Finally, we must take note of two recent cases involving problems with the same court reporter, Val Dixon-Sims. In both *McGehee v. State*, 328 Ark. 404, 943 S.W.2d 585 (1997), and *Jacobs v. State*, 327 Ark. 498, 939 S.W.2d 824 (1997), we reversed the appellants' convictions and remanded for new trials because the trial transcripts were inadequate for appellate review. However, *McGehee* and *Jacobs* both involved life sentences, thereby implicating Ark. Sup. Ct. R. 4-3(h). Without an adequate record, the requirements of Rule 4-3(h) were not satisfied. *See McGehee, supra; Jacobs, supra.*

The present appeal is not a Rule 4-3(h) case. We are therefore limited to considering only what is argued by the appellant on appeal. The trial transcript, when combined with the supplemental transcripts generated from the reconstruction hearings, provides us with an adequate record to fully consider the merits of Hood's appeal.

### 3.   *Voluntariness of statement.*

Hood gave three separate interviews to the police on three separate days. None of these statements was actually admitted into evidence at trial. However, Hood argues that the gun, which was recovered on the morning of January 5, was the fruit of a coerced statement on January 4. Thus, Hood maintains that the gun and its ammunition should have been suppressed at trial.

A custodial confession is presumed involuntary and the burden is on the State to show that the confession was voluntarily made. *Misskelley v. State*, 323 Ark. 449, 915 S.W.2d 702 (1996), *cert. denied*, 117 S. Ct. 246 (1996). When reviewing the voluntariness of confessions, we make an independent determination based on the totality of the circumstances, and reverse the trial court only if its decision was clearly erroneous. *Kennedy v. State*, 325 Ark. 3, 923 S.W.2d 274 (1996). In determining whether a confession was voluntary, the Court considers the following factors: age, education, and intelligence of the accused, lack of advice as to his constitutional rights, length of detention, the repeated and

prolonged nature of questioning, or the use of physical punishment. *Kennedy, supra; Oliver v. State*, 322 Ark. 8, 907 S.W.2d 706 (1995). Other relevant factors in considering the totality of the circumstances include the statements made by the interrogating officer and the vulnerability of the defendant. *Kennedy, supra; Oliver, supra.*

According to the officers' testimony, the January 4 interview with Hood began at approximately 3:40 and ended one hour later. Hood was read his *Miranda* rights, and Hood executed a form acknowledging his rights and waiving them. According to Officer Breedlove, Hood was coughing and appeared to have a cold during the interview. Breedlove admitted that Officers Oliver and Setterman used profanity during the course of the interview. At another point in the interrogation, Officer Breedlove asked Hood "if he knew what a moron was." At one time, an interrogating officer asked Hood, "Do I have moron written on my forehead?"

Later in the interview, Hood states that he knew a man who said he was going to get money from the bus station about a week prior to the robbery. In response, Oliver asks "Marcus, you're still stammering around. I don't believe that you let a seventeen-year old push you into this. I don't care what you say, you know about it." Oliver later says, "The truth is going to come out. We'll discuss it again. The gun where it came from, don't make us go back over this again, you will be up a creek. Tell me the truth. It won't hurt you, or will not hurt you."

Hood then admits that he gave Dunn the gun, and says that he "bought the gun from Clearly." The following sequence occurs next[1]:

> OFFICER: I don't think there is any use in taking a statement from you. Where is the gun?
>
> HOOD: He has the gun.
>
> OFFICER: Where is the gun and where is the money?

---

[1] The January 4, 1994, interrogation was reconstructed by the prosecutor and defense counsel from an abbreviated transcript prepared by defense counsel from the tape-recorded interrogation. The prosecutor read from this transcript in a narrative form, and both parties made additions and clarifications as it was read. For the sake of clarity, we have reproduced the interrogation in question and answer form.

HOOD: You all can take me back, I tried to tell you.

OFFICER: You have to live with this, I don't. Let me explain this to you where you can understand. I'm going to test your hand. What if he [Dunn] says you shot the man? I have to get prints off the gun to prove he lied to me, otherwise there is no proof you didn't do the shooting yourself. What if [Dunn] told me this? We know he shot the man. He said he did the shooting. Without the gun we can't prove it. It's for your benefit.

At this point Hood admits that the gun is in a ditch on Highway 52 where Tullos turned around:

OFFICER: Where is the billfold? I need it to show that he pulled it out. What is it going to look like if he said you pulled it out of his pocket? I believe the other guy is going to squirrel out of it and leave Marcus hanging.

OFFICER OLIVER: Your wife is in okay shape at the hospital. A parole hold has been put on you. They'll be here in the morning to get you. I need a gun and billfold if you don't want to take the rap for shooting the man.
[Hood provides directions to the gun].

OFFICER: Are you ready to talk to us? I want to know about the gun, the money and the wallet.

HOOD: I could tell you something later on if you let me talk to him [Dunn]. I will tape record him [Dunn].

OFFICER: Why are we delaying this, Marcus?

HOOD: He showed me about eleven $100.00 bills plus a stack of twenties.

OFFICER: Your wife went in the hospital yesterday. Your health insurance is not too good. Hospitals want money, don't they? You didn't have any money to pay them. How the hell is [Dunn] supposed to see you from back here where you say you were parked at? Why did you let him leave with the money? Why didn't you take some?

HOOD: Because I didn't want money on me when travelling. He was to give it to me later. [Dunn] meant to pay Leroy off so he wouldn't tell on me.

OFFICER BREEDLOVE: The question is how long are you going to go back to the pen and how much is your bond going to be. If I have a chance to make a recommendation on what you said today to the judge it will be $100,000 bond. That's what I would recommend.

OFFICER OLIVER: I'm going to arrest your wife also.

HOOD: She didn't have anything to do with it.

OFFICER BREEDLOVE: I want a written statement from you saying what happened, everything.

HOOD: I can't spell. You can't read it.

OFFICER: I will pick it up after a while. How far did you get in school?

HOOD: Seventh or eighth grade.

This concluded the interview. At the suppression hearing, Officer Oliver admitted that he was trying to intimidate Hood.

■■ With regard to the statements made by the police to Hood, it is significant that there were no threats of physical violence against him or promises of leniency. In two United States Supreme Court cases cited by Hood, *Arizona v. Fulimante*, 499 U.S. 279 (1991), and *Payne v. Arkansas*, 356 U.S. 560 (1958), credible threats of physical violence were levied against the accused to obtain confessions. As to the officer's assertions regarding Dunn's alleged statements, we have held that misrepresentations of fact, while relevant, do not necessarily render an otherwise voluntary confession inadmissible. *See Kennedy v. State*, 325 Ark. 3, 923 S.W.2d 274 (1996); *Tucker v. State*, 261 Ark. 505, 549 S.W.2d 285 (1977). In *Free v. State*, 293 Ark. 65, 732 S.W.2d 452 (1987), we "[found] no fault with an interrogator trying to persuade an accused to tell the truth, even though there may be misrepresentations of fact made by the interrogator, so long as the means employed are not calculated to procure an untrue statement and the confession is otherwise voluntarily made." Moreover, persistent questioning based upon the interrogator's assumption of the accused's guilt will not render a statement involuntary, particularly when the accused's story is presumed to be untrue on the basis of statements given by other persons present at the time of the crime. *Noble v. State*, 319 Ark. 407, 892 S.W.2d 477 (1995). As to the officers' appeal to Hood to consider the health of his wife and the threat of her arrest, we have observed that the police may, without violating an accused's rights, attempt to play on his sympathies or explain to him that honesty is the best policy, provided that the accused's decision to make a custodial statement is voluntary in the sense that it is the product of the accused's exercise of his free will. *Id.; see also Misskelley, supra* (police may use

some psychological tactics in eliciting a custodial statement from an accused). Although the interrogating officers' statements were obviously intended to influence Hood, we are unable to say that they were improper or contrary to basic notions of fairness, or that they procured an untrue statement.

■ With regard to Hood's vulnerability, he was twenty-two years old at the time of the interrogation. Additionally, he executed a rights–waiver form at the time of the interview. On January 4, 1994, he was only interrogated for approximately one hour, and was not handcuffed or bound. Also, Hood "was no stranger to the criminal justice system," a relevant factor discussed in *Misskelley v. State, supra.* Officer Breedlove testified that Hood never requested any food or bathroom privileges. Charlotte Tadlock, an emergency medical technician, examined Hood after he complained about feeling ill. She said he had a slight fever of only one–hundred degrees, which was "nothing major" in her opinion. While Hood said that he had a 104–degree temperature, this is simply a credibility determination best resolved by the trial court. Tadlock said that she gave him two aspirins, and observed that Hood appeared to be alert. Given the totality of the circumstances, we find that the trial court was correct in concluding that the January 4 statement was voluntary.

### 4. Failure to administer lesser-included instructions.

For this point, Hood argues that the trial court erroneously failed to instruct the jury with regard to the lesser-included offense of simple robbery. Hood's abstract shows that he moved for an instruction on simple robbery pursuant to "AMCI 301," which he proffered as Defendant's Exhibit Two, in addition to the "AMCI 301" transitional instruction proffered as Defendant's Exhibit Three. Hood's abstract also shows that he proffered "AMCI 2103" as Defendant's Exhibit Four, along with requested additions to "State's AMCI 8101" and "State's AMCI 8301", proffered as Defendant's Exhibit Five, as well as an objection to "State's 9202."

■ Hood has failed to abstract the instructions that were administered to the jury. More importantly, he has failed to

abstract his proffered instructions. Even the record lacks the substance of the various "defendant's exhibits" that Hood proffered. A proffered instruction must be included in the record and abstract to enable the appellate court to consider it. *Wallace v. State*, 326 Ark. 376, 931 S.W.2d 113 (1996). We thus decline to consider the merits of Hood's argument.

Affirmed.

NEWBERN, J., concurring.

BROWN, J., concurring.

DAVID NEWBERN, Justice, concurring. The majority opinion is correct. The ruling on Mr. Hood's directed-verdict motion renewal does not appear in his abstract of the record. As we limit our review of the record to that which is contained in the abstract, there was, so far as we allow ourselves to be concerned, no ruling on the motion. In view of the fact that the abstract shows that the trial continued after the motion was made, we may well be in contempt of common sense as Justice Brown allows in his concurring opinion. If so, it is not the first time.

The system of presenting the record to this Court through abstracting, and limiting our review to that which has been abstracted, has served this Court for a number of years. The abstracting method has indeed been a major contributor to our practice of keeping current despite a crushing load of cases. Anyone familiar with that system, however, must be aware that it has not been free of criticism and that resulting technical rulings have deprived this Court and our Court of Appeals of opportunities to rule on the merits of cases. We have always justified the system by repeating that there are seven justices on the Court and only one record of trial. *See, e.g., Cosgrove v. City of West Memphis*, 327 Ark. 324, 938 S.W.2d 827 (1997); *Duque v. Oshman's Sporting Goods*, 327 Ark. 224, 937 S.W.2d 179 (1997). Thus, each of us must have an abstract of the record because it is too much trouble or too time consuming for us to share the record.

On the other side of the "only one record" coin, however, we often say we may "go to the record" to affirm. *See, e.g., Hosey v. Burgess*, 319 Ark. 183, 890 S.W.2d 262 (1995); *Haynes v. State*,

314 Ark. 354, 862 S.W.2d 275 (1993). We obviously mean that, even though the abstract does not contain an essential item, if we can find it in the record we may recognize its existence if the result is to affirm. There also have been instances, exemplified by Justice Brown's concurring opinion in this case, in which time has been found by a justice to go to the record to see what happened at the trial. Apparently the justice who possessed the record while the case was on appeal in this Court had no objection to sharing it with Justice Brown. So long as all appellate judges and justices maintain offices near each other and near the Clerk's Office — in our case all in the same building — records of trial are available to any who care to see them.

The time has come again to consider being less technical. In our *per curiam* order of July 15, 1996, entitled, "In re: Supreme Court Rule 1-2, and Other Matters Related to the Jurisdiction of the Supreme Court and the Court of Appeals," we noted the expansion of the Court of Appeals and discussed the role each court should play in the context of revising the manner of dividing jurisdiction. We provided for the cover sheet as the first step in identification of cases which should come to the Supreme Court where they will be decided by seven justices sitting *en banc* as opposed to, usually, the panels of three judges in the Court of Appeals. With the expansion of the Court of Appeals that Court will soon be relieved of the burden of the large backlog of cases it has endured the last few years. Contemplated revisions of our rules will put an end to the Supreme Court's having to decide as many as ten or twelve cases per week so as not to develop a backlog.

By a *per curiam* order of October 17, 1988, entitled "*In Re: Revision of Rules of the Supreme Court*," we began an experiment in which parties to cases on appeal in this State were allowed to forego presenting abstracts and to present instead an expanded "statement of the case" to be supplemented as necessary with an appendix containing photocopies of crucial pages from the record of trial. The system we devised was much the same as those used in other states and by the federal courts. Our announced purpose was to alleviate our concern "about whether our system requiring

abstracting of the record is worth the effort lawyers must devote to it, and thus the money litigants must invest in it, in each case."

Our appendix system was flawed in some ways. For example, it did not require record-page references in the statement of the case, and it had no provision for presenting a joint appendix. The main reason we called a halt to it, however, was not that such problems were insoluable; rather, it was that lawyers could not seem to get used to the idea that the statement of the case was the primary replacement for the abstract and that the appendix was to be used only as a resource tool to resolve any potential or extant dispute about facts or what had happened at the trial. Lawyers who had been made justifiably paranoid by our decisions refusing to decide the merits of cases due to incomplete abstracts seemed to have the feeling they needed to present far more than was necessary in an appendix. Appellate judges complained of needing wheel barrows to carry briefs with their appendices. There seemed to be no realization on the part of attorneys who were not accustomed to that system through federal court practice that there was no draconian provision for affirmance in the event of an incomplete appendix.

We ended the appendix experiment by our *per curiam* order of June 10, 1991, entitled *In Re: Revision of the Rules*, which we concluded with the following language:

> If we find a way to bring our case load and that of the Court of Appeals within reason, we may return to the appendix system, with some revisions, because we continue to wish to implement the goals stated in our original order. We would like our system to be as inexpensive and simple as possible. Under other circumstances we will be able to exercise the patience required to permit lawyers and litigants to become accustomed to the change and to fine tune it with revisions.

In a profession devoted to achieving justice and fairness through precedent, stability and reliance upon the past are very important; unwillingness to change is a resulting trait. Given (1) the fact that this Court and our Court of Appeals may at last be in a position to exercise the patience necessary to facilitate a major change in the manner of presenting cases to us, (2) a better effort on our part to produce a less flawed appendix-system rule, and (3)

a stronger effort to educate lawyers and litigants concerning the proper use of such a system, we should be able to decide our cases more often on their merits than on the failures of lawyers or litigants to tell us what is in a record of trial which is usually just down the hall and certainly present in our conference room as we hold our decisional conference.

If we and our Court of Appeals can find the fortitude to implement a system that will permit us to reach the merits of cases which hitherto have been caught in the abstract trap, the administration of justice in Arkansas will be better served.

ROBERT L. BROWN, Justice, concurring. I concur in this decision but write separately because I would reach the merits of Hood's argument and affirm based on sufficient evidence.

In *Walker v. State*, 318 Ark. 107, 883 S.W.2d 831 (1994), we established the bright line rule that a defendant in making a motion for directed verdict must state the specific grounds supporting the motion. The *Walker* decision was followed by *Durham v. State*, 320 Ark. 689, 899 S.W.2d 470 (1995). In *Durham*, we held that when a criminal defendant makes a specific motion for directed verdict at the close of the State's case and proceeds to present evidence on his own behalf, a general renewal of all motions at the close of the evidence suffices to preserve a sufficiency argument. *See also* Ark. R. Crim. P. 33.1. In the instant case, Hood complied with the requirements of *Durham v. State, supra,* and apprised the trial court fully of the argument he now makes on appeal. The trial court then continued the trial, according to the abstract, which is ample indication that the renewal motion was denied. (Indeed, the record includes the trial court's ruling denying the motion.)

The majority declines to reach Hood's sufficiency argument for the sole reason that his abstract does not reflect a ruling on the renewal motion. Under our rules, an abstract is "flagrantly deficient" only when it fails to include "such material parts of the . . . record as are necessary to an understanding of the questions presented to the Court for decision." *See* Ark. S. Ct. R. 4-2(a)(6) & 4-2(b)(2). Here, the abstract clearly reflects a renewal of the directed-verdict motion followed immediately by the trial court's

continuation of the trial. Common sense should take hold at this juncture and direct this court to the obvious conclusion that the motion was denied.

In a comparable case just last year, three justices of this court concluded that when the abstract showed that a lawyer renewed a motion for directed verdict and the trial judge immediately commenced to instruct the jury, it was clear that the trial judge had, by his actions, denied the lawyer's renewed motion. *See Danzie v. State*, 326 Ark. 34, 45, 930 S.W.2d 310, 316 (1996) (Dudley, J., concurring). The same holds true in this case.

The abstract sufficiently shows that the renewal motion was denied. I would reach the merits.