Willie Gaster DAVIS *v*. STATE of Arkansas

CR 97-401

953 S.W.2d 559

Supreme Court of Arkansas
Opinion delivered October 2, 1997

*Arkansas Public Defender Commission*, by: *Teri Chambers*, for appellant.

*Winston Bryant*, Att'y Gen., by: *David R. Raupp*, Asst. Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. The appellant, Willie Gaster Davis, appeals his judgments of conviction for first-degree murder, robbery, theft of property, and false imprisonment. On appeal, he argues that the trial court erred in failing to suppress his statement and that uncounseled misdemeanor convictions were impermissibly introduced against him during sentencing. We find no error and affirm.

Because Davis does not challenge the sufficiency of the evidence on appeal, we provide only a brief recitation of the facts adduced at trial. Traci Noble testified that she was best friends with the victim, Nikki Muse. On April 21, 1995, Muse (who was driving) and Noble went out riding in a white Grand Am belonging to Noble's sister. They eventually went to Dumas to find Odis Madden, "Mane," a friend of Noble's. While driving in Dumas, they saw some boys on the corner who flagged them down. Noble explained that they were looking for Madden, and the boys answered that they could show them where he lived. Noble and Muse allowed these three boys to enter the back seat of the vehicle, although Noble said that neither she nor Muse knew who they were.

Noble testified that these boys led them to a dead-end street, and told them that Madden lived at a house that did not have lights on at the time. The boy on Noble's side of the car began to get out of the vehicle, pulled her out of the car, and grabbed the gold chains she was wearing, telling her to "give him my money." Noble testified that the boy on Muse's side of the vehicle "[did] the same thing with her, Nikki." Noble later identified the man

behind her who took her chains as Willie Spencer. She thought the boy in the middle, who ran away, was named Bryan. The third boy pushed Muse into the passenger seat, sat in the driver's seat, and drove away. Noble saw this boy demand money from Muse, who in turn gave money to him. Noble testified that there was no doubt in her mind that Muse did not want to go with this boy. She never saw Muse alive again. She made an in-court identification of Davis as the man who demanded money from Muse and drove off with her. Noble managed to ultimately escape from Spencer after which she contacted the police. At the police station Noble was shown a photo lineup and eventually identified Davis as the man who drove off with Muse.

Spencer testified that on April 21, 1995, he was standing around with Willie Davis and Bryan Woods on Cherry Street in Dumas. He said that two girls approached them driving a white Grand Am; he knew the names of both girls. He testified that Noble asked them if they wanted to go riding, and if they knew where Odis Madden lived. The boys got in the car and led the girls to a dead-end street. Spencer testified that Davis got in the car first, behind Muse, then he got in, and then Bryan Woods. They directed the girls to a dead-end street, Peach Street, when Spencer grabbed Noble and took her chains; Bryan Woods then ran away. Spencer testified that he demanded money from her, but that he gave Noble her chains back.

Spencer saw Davis get out of the car telling Muse "to scoot over," adding that Davis "[m]ight of did choke [Muse]." Spencer was then presented with his testimony from his own trial, where he testified that Davis "wasn't acting right. As soon as the car stopped. . . he said this is a robbery and he just grabbed her." Spencer also testified that he knew that Muse did not want to leave with Davis, and that it was Davis who directed the girls to Peach Street, which was not where Odis Madden lived.

A police officer found a vehicle matching the description of the missing Grand Am in front of 405 West Banks Street. Inside the police discovered Davis, who appeared to be asleep on a couch, as well as Muse in a sprawled position on the same couch. Muse was dead with what appeared to be blood coming from her

vaginal and anal areas. At this time Davis came up off the couch and said "did you get the other two." When asked who he was talking about, he said, "Willie Spencer and Bryant. They left with the other girl."

While in custody, Davis gave a statement to Everett Cox, the Dumas Chief of Police, which was admitted at trial. In this statement, Davis admitted that he told Muse to give him the money that she had and that he told her to get in the passenger side of the car. Davis said that they rode around looking for Noble and Spencer, and that Muse later consented to having sex.

The medical examiner's testimony established that Muse had neck injuries consistent with manual strangulation. Her injuries also suggested that she had been sexually assaulted.

The jury convicted Davis of first-degree murder, robbery, theft of property, and first-degree false imprisonment. The jury was unable to reach a verdict on the rape charge, and the trial court granted a mistrial on that count. For sentencing purposes, the underlying robbery and false-imprisonment convictions were merged with the first-degree murder conviction. The trial court, on the State's motion, dismissed the theft of property misdemeanor conviction. The jury sentenced Davis to a term of life imprisonment.

### 1. Voluntariness of Davis's April 28 Statement.

At the suppression hearing, Chief of Police Everett Cox testified that at 5:47 a.m. on April 22, after Davis was read his *Miranda* rights, Davis said that he would not make a statement. Later that morning, Davis was taken to Dumas Municipal Court for his arraignment. Cox was aware that at the time, attorney Bing Colvin was appointed as Davis's public defender. Cox conceded that any subsequent contact with Davis would have been after the appointment of counsel for Davis. Cox testified that at 1:54 p.m. on April 22 he initiated contact with Davis in an attempt to take a statement from him. On April 23, Cox recalled that someone from the police again initiated contact with Davis in an attempt to take a statement. Cox was not sure who initiated this contact, but believed it was Investigator Donigan.

Cox testified that on April 28, Davis contacted him "through the jail," saying that he wanted to talk with him. When asked whether anyone made contact with Davis prior to that request, Cox answered in the negative. After Cox received this request, he conducted a videotaped interview with Davis. Cox testified that on the videotape, he "asked [Davis] to state why he wanted to talk and he said that he did make initial contact with me before anything was done." Cox added that he read Davis his *Miranda* rights, and that no threats or other coercive acts were directed toward Davis off of the camera. Additionally, Davis was not restrained, and he made no requests that were denied him. Davis also executed a rights–waiver form that was filled out by Cox as Davis answered the questions; Davis initialed the individual responses. Cox also wrote out the substance of Davis's statement; Davis signed this statement at the end.

Officer Michael Donigan testified that on the afternoon of April 22, at 1:54 p.m., he came into contact with Davis to question him about the homicide. Donigan read Davis his *Miranda* rights from a rights form, which Davis executed. Donigan wrote down the substance of Davis's statement. Donigan also testified that he was present at 1:19 p.m. on April 23, when he and Officer Monty Kilibrew again executed a rights waiver with Davis, however Davis declined to make a statement at this time.

Chester Lee James, Jr., an inmate at the Dumas City Jail while Davis was also incarcerated there, testified that the police contacted Davis. James recalled that either Officer Donnahoe [sic?] or Kilibrew "consulted with [Davis] at one time. . . asked [Davis]. . . why he killed the girl." James testified that Davis became upset at this questioning. After this, the officer told Davis that he "want[ed] to make sure you get the chair." When asked to recall how long Davis had been in jail when this contact occurred, James answered three or four days. James also testified that on April 28, he contacted the chief of police at Davis's request.

Prior to trial, the State conceded that the statements taken at 1:54 p.m. on April 22 and the one taken at 1:19 p.m. on April 23[1] were inadmissible because the interrogating officers could not recall who initiated the questioning with Davis. However, the trial court overruled the motion to suppress with respect to the April 28 statement, which was ultimately admitted at trial.

On appeal, Davis contends that the trial court erred in denying his motion to suppress his April 28 statement. He first argues that this court's holding in *Bradford v. State* 325 Ark. 278, 927 S.W.2d 329 (1996), *cert. denied* 117 S. Ct. 583 (1996), mandates suppression of his April 28 statement, and alternatively argues that his waiver of rights and subsequent statement on April 28 was not voluntarily made due to the intervening police-initiated contacts.

■ Davis initially relies on *Bradford v. State, supra,* where this court held that an inculpatory statement taken without the presence of counsel, but after counsel had been appointed at a probable cause hearing, was a violation of the appellant's Sixth Amendment right to counsel. *Bradford* involved an analysis of *Michigan v. Jackson,* 475 U.S. 625 (1986), where the United State Supreme Court held that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation in invalid."[2] In *Bradford,* the appellant had not requested counsel, but counsel had nonetheless been appointed. This court concluded that the appellant's unawareness that she had been appointed counsel was irrelevant, "Just as a police officer who wishes to initiate an interrogation

---

[1] Actually, Davis did not give a statement on April 23.

[2] Both the Fifth and Sixth Amendments provide a right to counsel. Under the Fifth Amendment, the right to counsel is derived from the amendment's prohibition against self incrimination while in custody. *See Miranda v. Arizona,* 384 U.S. 436 (1966). In other circumstances, there may be a Sixth Amendment right to counsel. *See Kirby v. Illinois,* 406 U.S. 682 (1972) (Sixth Amendment right to counsel at critical stages of the prosecution). Under *Edwards v. Arizona,* 451 U.S. 477 (1981), once a defendant invokes his Fifth Amendment right to counsel at a custodial interrogation, the police may not interrogate any further until counsel is provided, or the "[defendant] himself initiates further communication[.]" *Michigan v. Jackson, supra,* may be seen as an application of the *Edwards* rule to the Sixth Amendment right to counsel. *See* David M. Nissman & Ed Hagen, *Law of Confessions* § 7:10 (2d ed. 1994).

during the custody stage must determine if a request for counsel has been made [citation omitted], simple diligence requires that police officers take pains to learn whether counsel was appointed at a probable cause hearing." *Bradford, supra.*

In the present case, Davis appears to concede that the holding in *Michigan v. Jackson* is limited to police-initiated interrogation, yet maintains that this court in *Bradford v. State, supra,* did not "specify that its ruling was based on the fact that police officers rather than Bradford initiated the contact." This argument is misplaced. A plain reading of *Bradford v. State* suggests that this court had no intention of broadening the Supreme Court's holding found in *Michigan v. Jackson.* Rather, the question presented in *Bradford* was whether the appellant's failure to actually request counsel affected her right to counsel under *Michigan v. Jackson,* and if knowledge of the municipal court's appointment of counsel could be imputed to police. Davis concedes that "on April 28, 1995, it was undisputed that [Davis] initiated the contact with Chief Everett Cox." Because Davis himself initiated contact with the police on April 28, nothing in *Bradford v. State* or *Michigan v. Jackson* mandates a result opposite of that reached by the trial court. As one treatise has noted, "Even after counsel is appointed at arraignment, a defendant may choose to waive counsel without notice or consultation with an attorney. Under *Jackson,* police cannot initiate the contact, but the defendant is free to initiate the contact." DAVID M. NISSMAN & ED HAGEN, LAW OF CONFESSIONS § 7:10 (2d ed. 1994) (citing *Missouri v. Owens,* 827 S.W.2d 226 (Mo. Ct. App. 1991)).

Davis alternatively argues that even if he effectively waived his right to counsel, this action was coerced by the police efforts in contacting him after the appointment of counsel on April 22 and 23. A custodial confession is presumptively involuntary and the burden is on the State to show that the waiver and confession was voluntarily made. *Clark v. State,* 328 Ark. 501, 944 S.W.2d 533 (1997). In examining the voluntariness of confessions, this court makes an independent determination based on the totality of the circumstances, and reverses the trial court only if its decision was clearly erroneous. *Kennedy v. State,* 325 Ark. 3, 923 S.W.2d 274 (1996). As explained in *Mauppin v. State,* 309

Ark. 235, 831 S.W.2d 104 (1992), the inquiry into the validity of the defendant's waiver has two separate components: whether the waiver was voluntary, and whether the waiver was knowingly and intelligently made. In determining voluntariness, we consider the following factors: age, education, and intelligence of the accused, lack of advice as to his constitutional rights, length of detention, the repeated and prolonged nature of questioning, or the use of physical punishment. *Hood v. State*, 329 Ark. 21, 947 S.W.2d 328 (1997). Other relevant factors in considering the totality of the circumstances include the statements made by the interrogating officer and the vulnerability of the defendant. *Id.* In addition, the accused must have a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it in order for his waiver to be knowingly and intelligently made. *Esmeyer v. State*, 325 Ark. 491, 930 S.W.2d 302 (1996).

In the present case the thrust of Davis's argument is that the intervening police contacts on April 22 and 23 rendered his waiver and statement on April 28 involuntary. Davis emphasizes that after his initial expression of his intent not to make a statement and his appointment of counsel on the morning of April 22, the police made two separate attempts to take a statement from him. Chief Cox himself testified that this occurred at 1:54 p.m. on April 22 and later on April 23. The encounter at 1:54 p.m. on April 22 yielded a statement, not admitted at trial, while Davis did not give a statement at the interview at 1:19 p.m. on April 23. In the present case, the immediate fruits of the two police-initiated contacts were not admitted at trial. Additionally, there was a five-day gap between the police-initiated contact on April 23, and the defendant-initiated contact on April 28. To the extent that it can be argued the police-initiated contacts were an attempt at repeated questioning designed to wear down Davis's resistance or change his mind, this five-day gap would serve to avoid the effects of repeated questioning. *See Hatley v. State*, 289 Ark. 130, 709 S.W.2d 812 (1986).

Some courts have refused to recognize a defendant's initiation of contact with police when it is the result of an earlier, illegal interrogation. Nissman & Hagen, *supra*, § 6:35 at n.91. For example, in *Wainwright v. Delaware*, 504 A.2d 1096 (Del. 1986),

*cert. denied*, 479 U.S. 869 (1986), the defendant initiated a conversation and gave an inculpatory statement some forty-five minutes after an illegal police-initiated interrogation under *Edwards v. Arizona, supra*. That the defendant's response came forty-five minutes afterward did not "sanitize it". *Wainwright v. Delaware, supra*. The Delaware Supreme Court further explained:

> Nor does the fact that the defendant's statement was made after he was placed alone in a cell render it a purely spontaneous one. Indeed, the opportunity to mull over the effect of [the codefendant's] accusatory statements could reasonably have had the opposite effect — to impress upon the defendant the seriousness of his predicament and the need to rebut his codefendant's accusations. Any attempt to "spark" the accused's initiative to make a statement in the absence of counsel through presentation of evidence will contaminate the waiver. [citations omitted].

*Wainwright v. Delaware, supra*.

 In the present case, the record does not show that the police were attempting to "spark" Davis's initiative in making the April 28 contact. Significantly, the defendant-initiated contact came some five days after the last police-initiated contact. The evidence also suggests that Davis voluntarily waived his rights and elected to make a statement on April 28. Davis was nineteen years of age at the time of the statement. He had completed at least the ninth grade, and could read and write. A forensic mental evaluation showed that Davis's intellectual functioning was within the low-average range. The record also demonstrates that Davis was fully advised of his constitutional rights, as is evidenced by the execution of the rights-waiver form as well as Chief Cox's testimony. There was little or no evidence of threats of physical violence against Davis, promises of leniency, or other misrepresentations of fact. Based on the foregoing, we cannot say that the trial court was clearly erroneous in denying Davis's motions to suppress.

### 2. Admissibility of Uncounseled Misdemeanor Convictions.

During the sentencing phase of trial, the State introduced into evidence two misdemeanor convictions of third-degree bat-

tery that Davis obtained in 1994. Davis was only fined for these convictions, and was not sentenced to any time in prison. The record shows that Davis was not represented by counsel during these misdemeanor proceedings. On appeal, Davis argues that the admission of these uncounseled misdemeanor convictions constitutes reversible error.

Davis initially cites to *Baldasar v. Illinois*, 446 U.S. 222 (1980) (*per curiam*) (plurality opinion), *overruled by Nichols v. United States*, 511 U.S. 738 (1994), where the United States Supreme Court held that a constitutionally valid misdemeanor conviction obtained under *Scott v. Illinois*, 440 U.S. 367 (1979),[3] could not be used under an "enhanced penalty statute" to convert a subsequent misdemeanor into a felony with a prison term. This court followed suit in *State v. Brown*, 283 Ark. 304, 675 S.W.2d 822 (1984), where the trial court granted the defendant's motion to suppress three prior DWI convictions under a charge of DWI, fourth offense. The trial court suppressed these convictions because the defendant had not been represented by counsel in the earlier proceedings. This court affirmed, framing the issue as "whether [*Baldasar*] bars prior uncounseled misdemeanor convictions from being used to enhance punishment for a subsequent offense." *State v. Brown, supra*. This court observed that the case presented a similar situation to the enhancement statute in *Baldasar*, as the first DWI offense was punishable by imprisonment from twenty-four hours to one year, while the second, third, and fourth offenses were punishable in increasing ranges cumulating in imprisonment for one to six years on the fourth offense. The *Brown* court concluded that *Baldasar* controlled the facts of the case, and affirmed the trial court's suppression of the convictions.[4]

Davis fails to point out that in *Nichols v. United States*, 511 U.S. 738 (1994), the Supreme Court expressly overruled *Baldasar* in a case involving a criminal sentencing point assessed for a prior,

---

[3] In *Scott* the Supreme Court held that an uncounseled misdemeanor conviction is constitutionally valid if the defendant is not incarcerated.

[4] For subsequent Arkansas cases citing to *Brown* and *Baldasar* for this proposition, see, e.g., *Neville v. State*, 41 Ark. App. 65, 848 S.W.2d 947 (1993); *Rodgers v. State*, 31 Ark. App. 159, 790 S.W.2d 911 (1990); *Steele v. State*, 284 Ark. 340, 681 S.W.2d 354 (1984); *Lovell v. State*, 283 Ark. 425, 678 S.W.2d 318 (1984).

uncounseled misdemeanor conviction under the United States Sentencing Commission's Guidelines. The Court noted that "[e]nhancement statutes, whether in the nature of criminal history provisions such as those contained in the Sentencing Guidelines, or recidivist statutes that are commonplace in state criminal laws, do not change the penalty imposed for the earlier conviction." *Id.* Moreover, reliance on such a conviction was consistent with the "traditional understanding of the sentencing process," recognized as less exacting than the determination of guilt. *Id.* Accordingly, the Supreme Court overruled *Baldasar* and held that a valid misdemeanor conviction under *Scott v. Illinois, supra,* is also admissible to enhance punishment at a subsequent conviction.

■ The present case does not squarely present this court with an opportunity to reconsider the continuing validity of *Brown.* Notably, the uncounseled misdemeanor convictions were not admitted against Davis pursuant to a recidivist or enhancement statute as contemplated in *Baldasar* and *Brown.* Rather, the misdemeanor convictions were introduced under Ark. Code Ann. § 16-97-103(2) (Supp. 1995), which merely includes prior felony and misdemeanor convictions within the definition of "[e]vidence relevant to sentencing." This statutory scheme simply allows the jury or court to exercise its discretion in considering all evidence relevant to sentencing, and does not mandate automatic enhancement due to prior misdemeanor convictions. We have no doubt that this procedure for admitting uncounseled misdemeanor convictions otherwise valid under *Scott v. Illinois, supra,* would withstand scrutiny under *Nichols v. United States, supra.* Accordingly, we reject Davis's argument that the admission of these convictions constituted reversible error.

### 3. Rule 4-3(h) Compliance.

The record has been reviewed for prejudicial error pursuant to Ark. Sup. Ct. R. 4-3(h), and no reversible errors were found.

Affirmed.