Sherman NOBLE *v.* STATE of Arkansas

CR 94-572 892 S.W.2d 477

Supreme Court of Arkansas
Opinion delivered February 13, 1995

*Jeff Rosenzweig*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Senior Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. The present appeal is from a denial of post-conviction relief pursuant to Ark. R. Crim. P. 37.1 in a case previously entertained on appeal and dismissed by this court in *Noble* v. *State*, 314 Ark. 240, 862 S.W.2d 234 (1993). In that appeal, we held that the appellant, Sherman Noble, who had entered a conditional guilty plea to a capital-felony murder charge, had failed to adhere to the requirements of Ark. R. Crim. P. 24.3(b) regarding both the consent of the trial court and the prosecutor and the reservation in writing of his right to appeal.

In the present Rule 37 appeal, Noble contends that, contrary to the circuit court's finding, he received ineffective assistance of counsel at the trial level and on appeal as a result of the trial counsel's failure to preserve a written memorial of the right to pursue a conditional appeal under Ark. R. Crim. P. 24.3(b). More particularly, he asserts that, while the circuit court was correct in finding that he had established cause to complain under the two-pronged test set forth in *Strickland* v. *Washington*, 466 U.S. 668 (1984), the court erred in finding that he had not shown prejudice due to counsel's wrongdoing. We disagree and affirm the judgment of the trial court.

### Facts

It was unnecessary to set forth the facts in our opinion in Noble's initial appeal. However, in order fully to comprehend the scope of this review, we must now examine the circumstances and proceedings leading to Noble's claim.

On March 21, 1992, Sherman Noble, a Little Rock resident,

and two companions attempted to steal a BMW automobile from Tresia Jester, who was parked by a pay telephone at a service station in Pine Bluff. As Ms. Jester tried to leave in the car, Noble fired a sawed-off shotgun and killed her. Afterward, Noble left the other two men and returned to Little Rock.

The Pine Bluff Police Department received information about Noble's identity and location in Little Rock. On April 11, 1992, three Pine Bluff officers joined law enforcement authorities in Little Rock and one of the murder suspects, already in custody, for surveillance of a house where Noble was believed to be residing. As Noble left the house with another suspect in a pick-up truck, the third suspect positively identified him for the police. The officers followed the truck to a parking lot nearby, where both of the occupants were taken into custody. Each of the three suspects was placed in a separate facility, and a Pine Bluff police car transported Noble to Pine Bluff. Meanwhile, officers obtained a statement from one of the other suspects that incriminated Noble.

After arriving at the Pine Bluff Police Department, Noble was questioned at some length. At first, he denied having been in Pine Bluff on the night of March 21, 1992. Subsequently, he gave a statement at 5:06 p.m., indicating that he had been present at the time of the shooting but had not fired the fatal shot. Instead, he said, "the gun went off." The statement was transcribed by Detective Sergeant James Bacon and signed by Noble.

Dissatisfied with his response, the officers sought to obtain another statement and transported Noble to the local Arkansas State Police Headquarters for a polygraph examination. There, he was interviewed by Investigator John Howell, a polygraph examiner. The polygraph examination, however, was never administered. Instead, after a conversation with Investigator Howell, Noble asked for a piece of paper and wrote a statement admitting that, when he and his friends spotted Ms. Jester's car:

> I jump out car drunk with a gun that was not suppose to have any bullets in it he ["Veno," a companion] went to one side and I went to the other the woman got scared and tried to pull off but the tip of the gun was in the window and she pull off that jerk the gun because all at same time she was letting her window up and fired and that's how it

happen and I'm sorry today that happen but also ready to do almost any thing or punishment given.

The time recorded on the rights form was 8:16 p.m. on April 11, 1992.

On April 14, 1992, the State filed an information in Jefferson County Circuit Court charging Noble and his two companions with capital felony murder. Noble filed a motion on June 4, 1992, to suppress the in-custodial statements. The circuit court held an evidentiary hearing on August 18, 1992, in connection with the motion to suppress.

At the suppression hearing, Detective Lieutenant Mack Cook of the Pine Bluff Police Department testified that he read the "Standard Rights Form" to Noble at 5:06 p.m. on April 11, 1992, just before the first statement was transcribed by Sergeant Bacon. He explained to Noble why he was in custody and what the charges were. Lieutenant Cook participated in the questioning and noted that Noble never requested an attorney.

After the completion of the initial interrogation, the officers asked Noble if he would be willing to go to State Police Headquarters for a polygraph examination. Noble stated that he would but that he wanted to phone his mother in Forrest City first. He was allowed to make the call and eat dinner, after which Lieutenant Cook's involvement with the process ended.

Detective Rick Hill was present during the entire interview in Pine Bluff and confirmed Lieutenant Cook's testimony that Noble had not requested an attorney but said he would be willing to take a polygraph test after speaking with his mother. When the phone conversation ended, according to Detective Hill, Noble indicated that he was ready to continue the interview. Although Detective Hill accompanied Noble to State Police Headquarters, he was not present during the interview with Investigator Howell.

Detective Sergeant James Bacon testified that the officers "knew we were going to be given a false statement from the start when we talked to Mr. Noble." He stated that, prior to the taking of the first statement, he retrieved photographs of Ms. Jester and handed them to Lieutenant Cook, who showed them to Noble. During the interview, Sergeant Bacon said, Noble brought up the subject of the Christian faith. According to Sergeant Bacon, he

told Noble that, in his own belief as a Christian, "it did not matter who judged him on earth as long as he was right with the man upstairs."

Sergeant Bacon also noted that Noble never asked for an attorney and never sought to stop the interrogation. After the first statement was given, Sergeant Bacon said, Noble agreed to speak with State Police Investigator Howell, requesting only that he be allowed to speak with his mother before going. Sergeant Bacon then dialed the number.

Investigator John Howell of the Arkansas State Police, a polygraph examiner, testified that he met with Noble in the C.I.D. office at about 8:15 p.m. on April 11, 1992. He read the waiver of rights form to Noble, who signed the document after indicating that he did not want a lawyer and had not been subjected to promises, threats, pressure, or coercion.

At that point, Investigator Howell began discussing the polygraph examination with Noble. In a conversation lasting ten or fifteen minutes, he spoke to him about his Roman Catholic faith and the importance of telling the truth. Investigator Howell also emphasized that, with the aid of the test, "I will know . . . for a fact, whether or not . . . you fired the shot." After about ten or fifteen minutes of what Investigator Howell described as a "very casual" conversation, Noble said, "I want to tell you the truth." He then wrote his second, inculpatory statement.

Noble's testimony at the hearing was at some variance with that of the police officers. Noble recounted that when the photographs of Ms. Jester were produced he stated, "Man, you said I can stop my questions at any time," and "I just stopped." He claimed that Sergeant Bacon began talking to him about his religious background and said, "The truth will get you out. The truth will set you free."

The officers, said Noble, alternately told him he was lying and declared that they believed him, saying they would "take you down to the polygraph tester to make sure you are telling the truth." Noble testified that the officers continued to press him on the need to submit to a polygraph examination. He asserted that the officers never advised him that he didn't have to take the test.

According to Noble, he did not agree to take the polygraph

examination after talking to his mother but instead indicated that he wanted to see what she thought about it, "and then I'll come back and let you know." His mother admonished him to wait until she could come to Pine Bluff on the next day. When he got off the phone, Noble said, Sergeant Bacon "cussed me out," saying, "No, you're bullshitting us. We let you use the phone and you are still bullshitting us. You told me you was going to take the polygraph test after you talked to your mother." Noble testified that he then told the detective, "I ain't going to take the test. I'm just going to wait until she get up here." At that, Noble averred, Sergeant Bacon cursed at him again, though not in a loud voice, "and I looked around the room and it was something like six or seven of them. I said, 'Man, forget it. I'll go on and take it.'"

When Investigator Howell interrogated him, Noble said, he placed great emphasis on his Catholic faith and the importance of telling the truth. Noble stated that Investigator Howell stressed that, once he was connected to the polygraph machine, he would "know for sure" if he were telling the truth. As Investigator Howell continued to bring up "this religious thing" and began talking about confessing sins to God, Noble was, by his own account, ready to write his statement.

Noble admitted that he never requested to speak to an attorney. He acknowledged having had his rights read to him and having initialed the rights form. He stated that he had graduated from high school and had briefly attended college and business school. Noble admitted having been arrested twice, for possession and delivery of a controlled substance and burglary and theft of property.

After hearing the testimony, the circuit court found that the custodial statements were given freely and voluntarily. A conditional guilty plea was entered on October 25, 1992, and Noble was sentenced to life imprisonment without parole. He attempted to pursue a direct appeal to this court under Ark. R. Crim. P. 24.3(b). However, as noted above, this court dismissed the matter in light of his failure to conform to the rule's requirements concerning the consent of the trial court and the prosecuting attorney and the written reservation of the right to appeal, leaving Noble's plea and sentence in place. *Noble* v. *State, supra.*

Subsequently, Noble filed a post-conviction petition in the

Jefferson County Circuit Court, seeking relief under Ark. R. Crim. P. 37.1. On March 7, 1994, the circuit court entered an order denying the petition. Eight days later, on March 15, 1994, the court entered an amended order denying relief under the *Strickland* v. *Washington* two-pronged "cause" and "prejudice" test. The circuit court found that Noble had established cause, noting that the trial counsel's failure to observe the procedural requirements for preservation of the right of appeal "fell below the standard of competence required, whether that is denominated as ineffective assistance of counsel at trial or on appeal."

In applying the appropriate standard for determining prejudice — whether there was a reasonable probability that Noble would have succeeded on the merits of his appeal had it been determined on the merits — the circuit court observed that "To make that finding would in essence require the Court to reverse its decision on the motion to suppress from which Defendant attempted to appeal." Noting that there was no further evidence to present, the circuit court declined to reverse its ruling denying the motion to suppress. From that decision, this appeal arises.

### Rule 37.1

For reversal, Noble argues that the circuit court erred in denying the petition seeking post-conviction relief pursuant to Rule 37.1. He contends that he received ineffective assistance of counsel at both trial and appellate levels as a result of the trial counsel's failure to reserve in writing the right to pursue a conditional appeal under Ark. R. Crim. P. 24.3(b).

■ A defendant in a criminal case is entitled to the effective assistance of counsel on direct appeal. *Evitts* v. *Lucey*, 469 U.S. 387 (1985). According to Noble, his former appellate counsel was ineffective as measured by the standards set forth by the United States Supreme Court in *Strickland* v. *Washington*. Those standards were explicitly adopted by this court in *Dumond* v. *State*, 294 Ark. 379, 743 S.W.2d 779 (1988).

In *Strickland*, the Supreme Court held that:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. This requires

showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

A court deciding an ineffectiveness claim must judge the reasonableness of the challenged conduct on the facts of the particular case within the context of the wide range of presumptively competent assistance. *Id.*, at 690. But even professionally unreasonable errors by counsel do not warrant setting aside a conviction if the errors were not prejudicial to the defense and had no effect on the judgment. *Id.*, at 691-2. It is necessary to show, in the second prong of the *Strickland* test, that, but for counsel's errors, the outcome of the criminal proceeding would have been different. *Rowe* v. *State*, 318 Ark. 25, 883 S.W.2d 804 (1994); *Dumond* v. *State, supra.*

The circuit court's finding that Noble had established the first prong of the *Strickland* test relating to the deficient performance of his attorney (or "cause," as the circuit court phrased it) is not at issue in the present case. It is necessary, therefore, to address the second prong relating to prejudice.

This court must determine whether there is a reasonable probability that the outcome of the case would have been different but for counsel's error. *See Pruett* v. *State*, 287 Ark. 124, 697 S.W.2d 872 (1985). The critical issue, then, for purposes of this review, is whether it is reasonably probable that Noble's direct appeal would have been successful. In order to determine whether Noble would have prevailed on a direct appeal, we must consider whether the circuit court correctly concluded that the in-custody statements were freely and voluntarily given and properly denied Noble's motion to suppress the custodial confession.

■ Custodial statements are presumed to be involuntary. *Weaver* v. *State*, 305 Ark. 180, 806 S.W.2d 615 (1991); *Moore* v. *State*, 303 Ark. 1, 791 S.W.2d 698 (1990). In *Miranda* v. *Arizona*, 384 U.S. 436, 467 (1966), the United States Supreme Court recognized that custodial interrogation inherently produces "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Hence, the Court in *Miranda* imposed a clear standard obliging police to apprise a suspect of the State's intention to use his statements to secure a conviction and, further, to inform him of his rights to remain silent and, if desired, to have counsel.

■ The State must prove to the trial court by a preponderance of the evidence that the defendant's custodial statement was voluntary. Ark. Code Ann. § 16-89-107(b) (1987). Moreover, the burden is on the State to show that the confession in question was made voluntarily, freely, and understandingly, without hope of reward or fear of punishment. *Thomas* v. *State*, 315 Ark. 504, 868 S.W.2d 483 (1994); *Jackson* v. *State*, 284 Ark. 478, 683 S.W.2d 606 (1985).

■ In determining whether a custodial statement is voluntary, this court undertakes an independent review of the totality of the circumstances and reverses only if the trial court's findings are clearly against the preponderance of the evidence. *Thomas* v. *State, supra; Sanders* v. *State*, 305 Ark. 112, 805 S.W.2d 953 (1991). Only if the totality of the circumstances reveals both an uncoerced choice made by the defendant to relinquish his right to remain silent and a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it may a court properly conclude that a defendant's *Miranda* rights have been waived. *Moran* v. *Burbine*, 475 U.S. 412 (1986); *Mauppin* v. *State*, 309 Ark. 235, 831 S.W.2d 104 (1992).

■ The totality of the circumstances is subdivided into two further components: the statement of the officer and the vulnerability of the defendant. *Thomas* v. *State, supra; Sanders* v. *State, supra.* Among the factors to be evaluated in considering the totality of the circumstances are the age of the accused, lack of education, low intelligence, lack of advice of constitutional rights, length of detention, repeated and prolonged questioning,

and the use of physical punishment. *Henderson* v. *State*, 311 Ark. 398, 844 S.W.2d 360 (1993).

In reviewing the totality of the circumstances, we must refocus on the facts in detail and, in doing so, resolve all doubts in favor of individual rights and safeguards. *Davis* v. *State*, 275 Ark. 264, 630 S.W.2d 1 (1982). However, in reviewing a trial court's ruling on the suppression of custodial statements, we view the evidence in the light most favorable to the State. *Moore* v. *State, supra.* When testimony on the circumstances surrounding the taking of a custodial confession is conflicting, it is the trial court's province to weigh the evidence and resolve the credibility of the witnesses. *Higgins* v. *State*, 317 Ark. 555, 879 S.W.2d 424 (1994); *Thomas* v. *State, supra; Orr* v. *State*, 288 Ark. 118, 703 S.W.2d 438 (1986).

Two custodial statements are at issue in the present case. With respect to the first, transcribed at the Pine Bluff Police Department by Sergeant Bacon, Noble points out that the interrogating officers departed from normal policy by not taping the interview. He states in his brief that the police continued to interrogate him, even after he had given his first statement and had said that he wanted to stop. The officers acknowledged having been unconvinced by the initial statement and having persisted in questioning Noble because his account was at variance with those of his co-defendants. We have held that persistent questioning based upon the interrogator's assumption of the accused's guilt will not render a resulting confession involuntary, particularly when the accused's story is presumed to be untrue on the basis of statements given by other persons present at the time of the crime. *Gardner* v. *State*, 263 Ark. 739, 569 S.W.2d 74 (1978), *cert. denied*, 440 U.S. 911 (1979).

Noble also claims that the appeals to his religious sympathies made in connection with both statements were coercive and prompted his confession. Sergeant Bacon had admonished him that "in my belief as a Christian it is not who judges you on this earth, it is what the good Lord will judge at the end of your life, and that's the only person you have to be right with." Inspector Howell had told Noble that he was a Catholic and that it was important to tell the truth.

These appeals are characterized by Noble as "significantly

evocative" of the "Christian burial" speech disapproved by the United States Supreme Court in *Brewer* v. *Williams*, 430 U.S. 387 (1977). In that case, however, the accused had already invoked his right to counsel and terminated the interrogation, and the voluntariness of the confession was not at issue. In the present case, the remarks on religion occurred during two different interrogations in which Noble never requested counsel.

 The police may use some psychological tactics in eliciting a custodial statement from an accused. *See Miller* v. *Fenton*, 796 F.2d 598 (3rd Cir. 1986), *cert. denied sub nom. Miller* v. *Neubert*, 479 U.S. 989 (1986). For example, the police may, without violating an accused's rights, attempt to play on his sympathies or explain to him that honesty is the best policy, provided that the accused's decision to make a custodial statement is voluntary in the sense that it is the product of the accused's exercise of his free will. *Miller* v. *Fenton*, supra. Appeals to an accused's religious sympathies do not automatically render a confession involuntary. *See Welch* v. *Butler*, 835 F.2d 92 (5th Cir. 1985); *Stawicki* v. *Israel*, 778 F.2d 380 (7th Cir. 1985).

 On the basis of the evidence presented at the suppression hearing and the arguments set forth in his brief, it cannot be said that Noble was so singularly vulnerable to the broadly based religious appeals made by the police officers that his free will was completely overborne. Indeed, the extent of Noble's religious conviction is illuminated by his comment at the suppression hearing that "I told [the police] I was a Baptist and believed in God and all." Although he claims that Investigator Howell urged him to confess all his sins, Investigator Howell's own testimony does not indicate that such an exhortation occurred. Any conflict in the testimony was for the circuit court to resolve. *Thomas* v. *State, supra.*

 Noble also asserts that the police engaged in coercive conduct by showing him photographs of the murder victim. Again, police officers are permitted to exert psychological pressure on an accused so long as they do not completely overbear his free will. *See Miller* v. *Fenton, supra*. Showing a murder suspect photographs of the murder victim is not inherently coercive police conduct, as indicated by the case of *Derrick* v. *Peterson*, 924 F.2d 813 (9th Cir. 1990), *cert. denied*, 112 S. Ct. 161 (1991).

There, the Ninth Circuit Court of Appeals held that the police did not coerce a confession from the accused by showing him for identification purposes photographs of the corpses of his father and stepmother, whom he had killed with a shotgun. In the present case, the display of photographs of Ms. Jester did not exceed the bounds of non-coercive psychological tactics.

A credibility question is at issue in Noble's assertion that the police officers denied him the right to remain silent in connection with the taking of the polygraph examination. We have held that, once an accused has invoked his right to remain silent, the police must scrupulously honor that right. *Hatley* v. *State*, 289 Ark. 130, 709 S.W.2d 812 (1986). The testimony, however, was in conflict, and it was for the circuit court to resolve the credibility of the witnesses. *Thomas* v. *State, supra.* As for Noble's contention that the "more damning statement" was obtained through Investigator Howell's claims for the reliability of his polygraph equipment, we have held that telling an accused that he would not pass a polygraph examination if he did not tell the truth was not a threat. *Gardner* v. *State, supra.* In any event, the polygraph examination was never administered.

Finally, Noble himself testified that he had attended college and business school and had previous experience with the criminal justice system, having been arrested on drug, burglarly, and theft charges and having had his *Miranda* rights read to him. In the present case, he had signed and initialed a *Miranda* form.

Thus, it cannot be said that Noble suffered prejudice or that the trial court committed reversible error in denying post-conviction relief.

Affirmed.