Dheaslee WRIGHT *v.* STATE of Arkansas

CR 98-509                                983 S.W.2d 397

Supreme Court of Arkansas
Opinion delivered December 17, 1998

*W. Ray Nickle*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Mac Golden*, Ass't Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant Dheaslee Wright appeals the judgment of the Mississippi County Circuit Court convicting him of the capital murder of seventy-two-year-old Russ Hinkle and sentencing him to life imprisonment without the possibility of parole. Appellant argues on appeal that the trial court erred in admitting his taped confession, which he asserts was obtained in violation of his constitutional rights, and

in refusing to instruct the jury on the affirmative defense of duress. Our jurisdiction of this appeal is pursuant to Ark. Sup. Ct. R. 1-2(a)(2). We find no error and affirm.

The record reveals that on November 14, 1996, Appellant and three other young males stopped at a rest area along Interstate 55 near Blytheville, on their way to a basketball game in another town. All four males were armed with guns. One went into the restroom while Appellant and the other two males were near the vending machine outside the restroom. Appellant and the other two males entered the restroom and saw the first male arguing with the victim Mr. Hinkle. Appellant heard the victim telling the first male that he was not going to give him anything. The victim started cursing and began pushing the first male. The first male and another male then pulled out their guns. Appellant stated that the victim hit him in the jaw, and that he then pulled his gun from his shoulder holster, cocked it, and shot the victim multiple times. After the shooting, the four males fled the scene.

Appellant, who was sixteen years old at the time of the crime, was arrested two days later and taken to the Mississippi County Jail. The following morning, Appellant gave a taped confession to the murder. Appellant moved to suppress his statement on the grounds that (1) it was taken after he had already exercised his right to remain silent under *Miranda v. Arizona*, 384 U.S. 436 (1966), and (2) it was not voluntarily given after a knowing and intelligent waiver of his rights.

The trial court held a hearing on the suppression motion, during which the following facts were revealed. Appellant was arrested by Deputy Robb Rounsaville of the Mississippi County Sheriff's Department on November 16, 1996, at approximately 6:30 p.m. Immediately thereafter, at 6:40 p.m., Deputy Rounsaville read Appellant his *Miranda* rights from a statement-of-rights form. This was witnessed by two other officers: Arkansas State Police Trooper Lance Huey and Blytheville Police Officer Alice Bumpus. Deputy Rounsaville asked Appellant if he wished to make a statement, and Appellant replied that he did not. Appellant did not request to speak to an attorney or his mother. Deputy Rounsaville then placed Appellant in his patrol car and transported

him to the Mississippi County Jail. No further inquiry was made by the officers.

Approximately one hour later, Blytheville Police officers took custody of Appellant and transported him to the Blytheville Police Department to inquire about another crime, a burglary. At 7:43 p.m., Sergeant Joel Sparks informed Appellant of his rights from a statement-of-rights form. This took place in the holding cell at the Blytheville Police Department, in the presence of Officer Tommy Warren. Sparks stated that he did not threaten or coerce Appellant, nor did he make any promises to him. Appellant signed the waiver form and did not ask for an attorney. Sparks then asked Appellant if he wanted to answer some questions, to which Appellant replied, "Well, what do you want to know?" Sparks then questioned Appellant about a gun taken during a burglary that Appellant was suspected of having. Appellant advised Sparks that he had taken the gun apart and threw it into the senior citizen's pond behind Wal-Mart. Sparks stated that at that point, Appellant hung his head. Sparks told him that he needed to locate the gun before a small child found it. Appellant then stated that he wanted to speak with the detective that he had spoken to a couple of weeks earlier. Appellant did not know the officer's name, but when he described him, Sparks concluded that he meant Detective Ross Thompson.

When Detective Thompson arrived, at 8:27 p.m., he informed Appellant of his rights from a statement-of-rights form. Sergeant Sparks was present at the time. Again, Appellant signed the form and indicated that he was willing to answer questions. Appellant did not ask to speak with an attorney or his mother. Thompson testified that he did not threaten or coerce Appellant, nor did he make any promises to him in exchange for his agreement to give a statement. Thompson stated that he did not recall discussing the subject of bond with Appellant, but that it was possible that the issue was raised. Sparks stated that there was no discussion of bond or the seriousness of the charge, but that at one point Appellant asked if he was going to be allowed to go home, and Thompson told him he could not.

Thompson stated that after he informed Appellant of his rights, they began to talk about the incident at the rest area. The interview lasted from one and one-half to two hours. It was not tape-recorded. They talked about the weapon involved in the shooting, and Appellant agreed to show the officers where he had hidden it. Thereafter, Appellant was transported to the area where the gun was hidden. With the assistance of Detective Marvin Crawford, Thompson recovered the gun and the shoulder holster.

Upon returning to the police department, at approximately 12:10 a.m., Detective Thompson again advised Appellant of his rights from a statement-of-rights form. Detective Crawford was present at that time. The detectives conducted a tape-recorded interview of Appellant at 12:20 a.m., during which the detectives detailed the previous times that night that Appellant had been informed of his rights and had agreed to waive them. Each time, Appellant acknowledged that he had been advised of his rights, and that he had signed the rights form. Appellant stated that he understood his rights fully and was voluntarily agreeing to answer questions from Thompson and Crawford. Appellant also stated that he had not been promised anything for his statement, and that he had not been threatened, pressured, or coerced into making a statement. In fact, Appellant indicated that none of his prior statements that evening were the result of pressure or coercion. The following exchange occurred between Detectives Thompson and Crawford and Appellant:

> [THOMPSON]: Alright, um, let's just cover somethin' here again, just real briefly, you first, you were arrested this evening, is that correct?
>
> [APPELLANT]: Yes.
>
> [THOMPSON]: On uh, 17th Street?
>
> [APPELLANT]: Yes.
>
> [THOMPSON]: Okay, and you went to the sheriff's department, is that right?
>
> [APPELLANT]: Yes.

[THOMPSON]:     Okay. Uh, did they advise you of your rights out there?

[APPELLANT]:    Yes.

[THOMPSON]:     Did they uh, speak with you any or anything?

[APPELLANT]:    Nope.

[THOMPSON]:     Okay. And then you came back here to the Blytheville Police Department is when you asked to speak to me, is that correct?

[APPELLANT]:    Yes.

[CRAWFORD]:     What was your purpose of asking to speak to Mr. Thompson?

[APPELLANT]:    I know he ain't mean.

During the course of the interview, Appellant confessed to shooting Mr. Hinkle, but claimed that he had acted in self-defense. The interview concluded approximately forty minutes later, at 1:00 a.m.

At the suppression hearing, Appellant testified that he told Officers Sparks and Warren that he did not want to make a statement. He stated that he also asked to speak with his mother and an attorney, Ms. Cook. He stated that Sparks told him that he could not talk to anyone until he made a statement. He stated that Sparks later approached him alone and told him that if he cooperated, he would be given a lesser charge and allowed to get a bond. He stated that Sparks explained that it was not possible to obtain a bond on a charge of capital murder. He stated that he then agreed to cooperate.

On cross-examination, Appellant stated that when he was read his rights immediately after his arrest, he acknowledged to the officer that he understood those rights. He stated that he understood his right to remain silent. He stated that he told the other officers that he understood his rights, and that he only agreed to waive them because he thought he was going to get a deal. He later claimed that he did not really understand his rights and that he had lied to the officers when he told them that he did. He admitted, however, that he had been advised of his rights by

Detective Thompson on October 24, 1996, and that he stated then that he understood his rights and agreed to make a statement. Again, Appellant claimed that he lied when he told the detective that he understood his rights.

The trial court found that Appellant knew, understood, and comprehended his constitutional rights, and that he voluntarily agreed to waive those rights and speak to the officers. In making this finding, the trial court considered Appellant's age (he was sixteen years old at the time); his mental ability and capacity (he had a reading and learning disability and a functioning I.Q. of 86); the total length of his detention (between five to six hours); and the lack of any evidence of mistreatment by the police. The trial court found further that there was no violation of Appellant's *Miranda* rights resulting from his being questioned after he had initially indicated that he did not wish to make a statement. The trial court pointed to the fact that approximately one hour had lapsed between his initial request to remain silent and his being advised of his rights the second time, and that there was no inducement whatsoever by the officers to get him to make a statement. The trial court found significant the fact that Appellant specifically selected the officer to whom he wished to make a statement.

Following a jury trial, Appellant was convicted of capital murder and sentenced to life imprisonment without parole. This appeal followed.

## I.   *Interrogation after a Request to Remain Silent*

Appellant argues that the trial court erred in refusing to suppress his statement on the ground that the officers had not respected his exercise of his right to remain silent under *Miranda*, 384 U.S. 436. He argues further that the statement was taken in violation of the Supreme Court's holding in *Michigan v. Mosley*, 423 U.S. 96 (1975), because the officers failed to "scrupulously honor" his request to remain silent and not make a statement. We disagree.

In reviewing a trial judge's ruling on a motion to suppress, we make an independent determination based upon the

totality of the circumstances, viewing the evidence in a light most favorable to the State, and we reverse only if the ruling is clearly against the preponderance of the evidence. *Tabor v. State*, 333 Ark. 429, 971 S.W.2d 227 (1998). The credibility of witnesses who testify at a suppression hearing about the circumstances surrounding the appellant's in-custody confession is for the trial judge to determine, and we defer to the superior position of the trial judge in matters of credibility. *Id.* Conflicts in the testimony are for the trial judge to resolve, and the judge is not required to believe the testimony of any witness, especially that of the accused since he or she is the person most interested in the outcome of the proceedings. *Id.* So long as there is no evidence of coercion, a statement made voluntarily may be admissible against an accused even though he once previously refused to make a statement. *Harvey v. State*, 292 Ark. 267, 729 S.W.2d 406 (1987).

█ In *Mosley*, 423 U.S. 96, 104, the Supreme Court held that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" (Footnote omitted.) The Court explained:

> A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . . ." 384 U.S., at 479. The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." *Id.*, at 474. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting.

*Id.* at 103-104. Under *Mosley*, there are three factors for determining whether the police scrupulously honored the defendant's right of silence: (1) whether the police immediately ceased the interrogation upon defendant's request; (2) whether they resumed questioning only after the passage of a significant period of time and provided a fresh set of *Miranda* warnings; and (3) whether they

restricted the later interrogation to a crime that had not been the subject of the first interrogation. *Hatley v. Lockhart*, 990 F.2d 1070 (8ᵗʰ Cir. 1993).

The leading Arkansas case on this issue is *Hatley v. State*, 289 Ark. 130, 709 S.W.2d 812 (1986). There, the defendant, sixteen-year-old Benny Hatley, was arrested for the capital murder of two police officers. The arresting officer advised Hatley of his rights, but Hatley declined to make a statement. Hatley was then immediately taken to a cell. Two hours later, Hatley was brought out of his cell for trace-metal tests. Another officer approached Hatley and said: "I'm Bill Gage with the State Police. Benny, you're in a lot of trouble. You want to tell me about it?" Hatley replied, "Yes sir, I'll talk to you." Officer Gage then advised Hatley of his individual *Miranda* rights, after which Hatley confessed to killing the two officers.

Before discussing the merits of the appeal, this court pointed out that the Court rejected a literal reading of *Miranda* that would require "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances." *Id.* at 133, 709 S.W.2d at 814 (quoting *Mosley*, 423 U.S. at 102). Additionally, this court concluded that the Court's emphasis on interrogation about a *different* crime was misplaced, and that the important consideration is the "strict adherence to its dictates of scrupulously honoring the defendant's right to remain silent." *Id.* at 135, 709 S.W.2d at 815. This court held:

> To "scrupulously honor" the defendant's "right to cut off questioning" means simply that once the defendant has invoked his right to remain silent, his will to exercise that right will remain undisturbed; there must be no attempt to undermine his will and he must be secure in the knowledge he is under no compulsion to respond to any questions. Such a determination will, of course, depend on the facts in each case relative to the conduct of the police and of the defendant.

*Id.* Based upon the facts of that case, this court concluded that Hatley's rights had not been violated:

There is nothing to suggest there were efforts to wear down his resistance or to prevail on him to change his mind. When Hatley was brought to the station there was not even an attempt to question him after the Miranda warnings were given, and Gage's comment to him two hours later in the radio room was the first and only time Hatley was asked whether he had anything to say regarding the charges. *Having been fully informed that he had a right to remain silent, Hatley readily responded that he did wish to talk and the single fact that he had volunteered the earlier comment when the Miranda warnings were given cannot and should not void a statement clearly shown to have been made willingly.*

We note, too, that Hatley's detention prior to Gage's question was about two hours, of sufficient length to produce more than a momentary lull before being approached again, thus avoiding the effects of repeated questioning. *See Anderson [v. Smith]*, [751 F.2d 96 (2d Cir. 1984)], and *Mosley*, [423 U.S. 96]. Yet the interval was not so long as to produce an inference that his cooperation was the result of lengthy "incommunicado detention." *United States v. Pheaster*, 544 F.2d 353 (9th Cir. 1976). Nor do we think Gage's comment objectionable. It was direct and reasonable stating only the obvious, but lacking the quality of coercion and threat found in [*United States v.*] *Olof*, [527 F.2d 752 (9th Cir. 1975)].

*Id.* at 135-36, 709 S.W.2d at 815-16 (emphasis added).

■ Based upon the particular facts of this case, we conclude that there was no violation of Appellant's rights under *Miranda*. After Appellant initially requested to remain silent, the police officers immediately ceased interrogation and no further inquiry was made by them. Approximately one hour passed before Appellant was approached by different officers wishing to inquire of Appellant about a separate crime. These officers provided a fresh set of *Miranda* warnings. Appellant signed the rights form, agreeing to waive his right to remain silent. When they asked Appellant if he wanted to answer some questions, Appellant replied by asking them what they wanted to know. Appellant was then allowed to hand-pick the officer he wished to speak with, one that he already knew would not be mean.

■ The fact that during their inquiry the subject of this crime arose is unimportant, as this court previously determined in

*Hatley*, 289 Ark. 130, 709 S.W.2d 812, that the Supreme Court's emphasis upon interrogation of a different crime was misplaced. Other than Appellant's own self-serving statements, which conflicted with his statements given on tape, there was no uncontroverted evidence that Appellant had been coerced or promised anything by the officers, or that there was any attempt to undermine his will after he had initially chosen to remain silent. Moreover, it is of no consequence to Appellant that some of the officers' testimony conflicted on the issue of whether any attempts had been made to contact his mother. As stated previously, the trial judge determines the credibility of the witnesses and is thus free to believe or disbelieve the testimony of any witness. We thus conclude that there was no violation of Appellant's constitutional rights because the police officers scrupulously honored his initial request to remain silent.

## II.    Voluntariness of the Statement

Appellant argues that the trial court erred in ruling that his statement was voluntary. He argues that his statement was the product of police coercion and promises that he could get a bond if he cooperated. He argues that the totality of the circumstances surrounding his statement, including his age, his learning disability and low I.Q., and the fact that he was not allowed to contact his mother, demonstrate that the statement was not voluntary. We disagree.

We recently outlined the law regarding the voluntariness of a confession in *Davis v. State*, 330 Ark. 76, 83-84, 953 S.W.2d 559, 562-63 (1997):

> A custodial confession is presumptively involuntary and the burden is on the State to show that the waiver and confession was voluntarily made. *Clark v. State*, 328 Ark. 501, 944 S.W.2d 533 (1997). In examining the voluntariness of confessions, this court makes an independent determination based on the totality of the circumstances, and reverses the trial court only if its decision was clearly erroneous. *Kennedy v. State*, 325 Ark. 3, 923 S.W.2d 274 (1996). As explained in *Mauppin v. State*, 309 Ark. 235, 831 S.W.2d 104 (1992), the inquiry into the validity of the defendant's waiver has two separate components: whether the waiver

was voluntary, and whether the waiver was knowingly and intelligently made. In determining voluntariness, we consider the following factors: age, education, and intelligence of the accused, lack of advice as to his constitutional rights, length of detention, the repeated and prolonged nature of questioning, or the use of physical punishment. *Hood v. State*, 329 Ark. 21, 947 S.W.2d 328 (1997). Other relevant factors in considering the totality of the circumstances include the statements made by the interrogating officer and the vulnerability of the defendant. *Id.* In addition, the accused must have a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it in order for his waiver to be knowingly and intelligently made. *Esmeyer v. State*, 325 Ark. 491, 930 S.W.2d 302 (1996).

■■ When testimony on the circumstances surrounding the taking of a custodial confession is conflicting, it is the trial court's province to weigh the evidence and resolve the credibility of the witnesses. *Noble v. State*, 319 Ark. 407, 892 S.W.2d 477 (1995). The fact that the defendant is not a stranger to the criminal justice system is a factor that may be considered in weighing the totality of the circumstances. *Misskelley v. State*, 323 Ark. 449, 915 S.W.2d 702, *cert. denied*, 117 S. Ct. 246 (1996).

■ Appellant presented testimony that he had been placed in special education because he had a learning disability. Tests performed by a psychologist revealed that he has a full-scale I.Q. of 81 and a performance or functioning I.Q. of 86. His reading comprehension level is between the third and fourth grade. While age and mental capacity are factors to consider, standing alone they are not sufficient to suppress a confession. *Misskelley*, 323 Ark. 449, 915 S.W.2d 702. Likewise, a defendant's low I.Q. score does not mean that he is incapable of voluntarily making a confession or waiving his rights. *Id.* This court affirmed the admission of Misskelley's confession notwithstanding that he had an I.Q. of 72 and read at a third-grade level.

■ Considering the totality of the circumstances, we conclude that Appellant's confession was voluntarily given. He was advised of his constitutional rights four separate times, and he indicated that he understood his rights. He agreed to waive his right to remain silent on three of those four occasions. The first

interview lasted no more than two hours, after which they took a break to retrieve the murder weapon. The second interview lasted only forty minutes. The total length of detention from the time of his arrest to his confession was less than six hours. As stated in the previous point, there was no credible evidence, beyond Appellant's testimony, that the officers threatened or coerced him or promised him any special treatment in exchange for his statement. The evidence about his I.Q. and learning disability does not rise to the level of supporting the conclusion that Appellant was incapable of voluntarily making a statement, especially in light of the fact that only a couple of weeks before, he had been advised of his rights and had agreed to waive them and give a statement. This demonstrates that he was no stranger to the criminal justice system. We thus affirm the trial court's ruling to admit the confession.

### III. Proffered Jury Instruction on Duress

Appellant argues that the trial court erred in refusing to give AMCI 2d 606, the model jury instruction on the defense of duress. In support of his argument, Appellant contends that there was evidence that he had acted in self-defense. The State points out that the defenses of duress and self-defense are two different defenses, and that evidence that may support an instruction on self-defense will not necessarily support one on duress. The State argues that there was no evidence that Appellant acted under duress. We agree that the proffered instruction was not warranted by the evidence presented at trial.

This court has repeatedly stated that if there is some evidentiary basis for a jury instruction, giving the same is appropriate. *Yocum v. State*, 325 Ark. 180, 925 S.W.2d 385 (1996); *Mitchell v. State*, 314 Ark. 343, 862 S.W.2d 254 (1993). A party is entitled to an instruction on a defense if there is sufficient evidence to raise a question of fact or if there is any supporting evidence for the instruction. *Humphrey v. State*, 332 Ark. 398, 966 S.W.2d 213 (1998) (citing *Yocum*, 325 Ark. 180, 925 S.W.2d 385). There is no error in refusing to give a jury instruction on a defense where there is no basis in evidence to support the giving of the instruction. *Id.*

Arkansas Code Annotated § 5-2-208(a) (Repl. 1997) provides for the affirmative defense of duress:

> (a) It is an affirmative defense to a prosecution that the actor engaged in the conduct charged to constitute an offense because *he reasonably believed he was compelled to do so by the threat or use of unlawful force* against his person or the person of another that a person of ordinary firmness in the actor's situation would not have resisted. [Emphasis added.]

Appellant did not testify at trial, nor did he present any witnesses in his defense. The only evidence of Appellant's defense was presented through his tape-recorded statement, which, at best, amounted to a claim of self-defense, as opposed to duress. As such, there was no evidentiary basis for instructing the jury on the affirmative defense of duress. Appellant seems to confuse the defense of duress with that of self-defense. Indeed, during the proffer below, Appellant's counsel stated that the instruction was being offered "for the purpose that he did state that he was acting in self-defense in his statement and the conditions that they were under." Appellant did not request an instruction on self-defense. The trial judge refused to give Appellant's proffered instruction, stating that there was no aspect of duress or, for that matter, self-defense adduced during the trial. The trial court's ruling was not erroneous, as there was no basis in evidence to support Appellant's claim that he shot Mr. Hinkle under duress.

## IV. Rule 4-3(h)

In accordance with Rule 4-3(h) of the Arkansas Supreme Court Rules, the record has been reviewed for adverse rulings objected to by Appellant but not argued on appeal, and no reversible errors were found. For the aforementioned reasons, the judgment of conviction is affirmed.