Marlon Donte HOWELL *v.* STATE of Arkansas

CR 01-349 89 S.W.3d 343

Supreme Court of Arkansas
Opinion delivered November 14, 2002

554

*Linda Scribner,* for appellant.

*Mark Pryor,* Att'y Gen., by: *Kent G. Holt,* Ass't Att'y Gen., for appellee.

W H. "DUB" ARNOLD, Chief Justice. Appellant Marlon Donte Howell was found guilty of capital murder by a Hempstead County Circuit Court jury, and the trial court sentenced Howell to life imprisonment in the Arkansas Department of Correction. We affirm his conviction and sentence.

On April 29, 2000, Appellant Marlon Donte Howell was at a birthday party in Hope, Arkansas, where he got into an argument with Darryl Allen, Sr. After the altercation, Howell left the party. A short time later, Allen and two women were about to leave the party in Allen's van when an individual ran up to the window, shot, and killed Darryl Allen, Sr.

Witnesses in the house where the birthday party was being held stated that they heard a shot, came outside, and saw a man named "Donte," last name unknown, run past the house, but saw nothing in his hands. One woman seated in the van at the time of the shooting stated that the shooter ran in the opposite direction, away from the house.

Police officers were posted to watch the residences of all known "Dontes" from the area. Appellant Marlon Donte Howell was one of several "Dontes" that was being observed by the police. Howell was later arrested in the woods behind his house. He was taken to the police station and interviewed by detectives. Howell was read his Miranda rights from a written form and signed the form. Detectives did not record the first three interviews and only a portion of the fourth. At all interviews subsequent to the first, Howell was not read his rights again, but was told that he was still "under his rights." Howell did not have phone access or contact with anyone other than law enforcement. At the fourth interview, partially taped, Howell confessed to shooting Darryl Allen, Sr., and told detectives where the gun was located. Detectives later found the gun where Howell indicated.

Howell brings the following points on appeal: 1) sufficiency of the evidence; 2) whether there was probable cause to arrest Howell; and 3) whether Howell's custodial statement should have been suppressed.

## Sufficiency of the Evidence

Howell, in his third point on appeal, contends that the trial court erred in denying his motion for directed verdict. Double jeopardy considerations require this court to consider a challenge to the sufficiency of the evidence before other points are raised. *Beavers v. State*, 345 Ark. 291, 46 S.W.3d 532 (2001); *Jones v. State*, 336 Ark. 191, 984 S.W.2d 432 (1999); *Conner v. State*, 334 Ark. 457, 982 S.W.2d 655 (1998); *Britt v. State*, 334 Ark. 142, 974 S.W.2d 436 (1998). When a defendant makes a challenge to the sufficiency of the evidence on appeal, we view the evidence in the light most favorable to the State. *Beavers, supra; see Jones v. State, supra; Bell v. State*, 334 Ark. 285, .973 S.W.2d 806 (1998); *Bailey v. State*, 334 Ark. 43, 972 S.W.2d 239 (1998). Evidence, whether direct or circumstantial, is sufficient to support a conviction if it is forceful enough to compel reasonable minds to reach a conclusion one way or the other. *Beavers, supra; see Wilson v. State*, 332 Ark. 7, 962 S.W.2d 805 (1998). On appeal, this court does not weigh the evidence presented at trial, as that is a matter for the fact-finder; nor do we assess the credibility of the witnesses. *Beavers, supra.*

In the instant case, at the close of the State's case, Howell contended that the State had failed to demonstrate that he was an accomplice to the capital murder. This argument was based upon an inference drawn by defense counsel based upon some of the trial testimony that appeared to be in conflict as to which direction Howell ran after the victim was shot. This is a jury question about weight rather than one going to the sufficiency of the evidence, because the State did not allege that Howell acted with another in the commission of this offense. For the reasons explained below, Howell's argument is without merit.

The testimony at trial revealed that on April 29, 2000, Howell was at a party at a residence located at 700 North Graham,

in Hope. During the party, an apparent argument occurred between Howell and the deceased, Darryl Allen, Sr. Howell left the party in a car with someone else. A short time later, Darryl Allen, Sr., and two women, Carolyn Rodgers and Trenice Pennington, got into a van to leave when the two women saw someone approaching the van. Neither woman recognized the individual, although Trenice Pennington testified that she knew Donte Howell. This individual then approached the van and shot Darryl Allen, Sr., while he was sitting in the driver's seat. Carolyn Rodgers testified that the shooter then ran away from the house, ran down the hill, and behind the north side of the nursing home. Trenice Pennington did not see which way the shooter ran. Carolyn Rodgers told the detectives that if she saw the shooter again, she would be able to identify him. She was shown a photo lineup, computer photos, and a physical lineup, and in none of these did she pick out Donte Howell as the shooter. She repeatedly advised detectives that Donte Howell did not look like the shooter and that the shooter was taller. The medical examiner's testimony would seem to confirm a tall suspect, as he testified that the bullet that killed Darryl Allen, Sr., traveled down and across into his skull as he was sitting in the driver's seat of the van.

Carolyn Rodgers was adamant that the shooter did not run beside the house. She testified at trial, with Howell sitting at defense table, that she has never seen the shooter again since that night. Rodgers testified that the shooter was wearing a black sweater and white hat. Trenice Pennington testified that she saw an individual approach the van, and he was wearing a black jacket, light jeans, and a white hat. She thought it was a friend of Darryl's wanting to talk and even asked, "Who is that?" He then approached the van and shot Darryl. Trenice also testified that she knew Donte Howell previously.

Lamario Hightower testified that he was inside the house, heard the shot, came outside, and saw a black male named Donte, wearing all black, run from the residence and run east on Avenue H, which is on the opposite side of the house. He said it was "Donte," but did not know his last name. He later identified the man he saw running as Donte Howell. He also testified that he did not see a gun in Donte's hands as he was running and that the

defendant ran right by the edge of the porch. This testimony was completely contradictory to Carolyn Rodgers's testimony about the direction in which the shooter ran.

Sherrie Purifoy testified that she was in the house when she heard the shot, and she went to the door and saw Donte running toward the house from the direction of the van. She testified that she did not see anything in his hands.

Officer Rick Hunter testified that he took fingerprints from the driver's side window of the van and sent the prints to the crime lab for comparison. The prints neither matched those of Darryl Allen, Sr., nor Howell.

The police subsequently arrested Howell after he attempted to evade apprehension. Howell gave a statement admitting that he had gotten into an altercation with the victim, left the scene and returned on a bicycle. Howell told investigators he waited there until the victim came out of the house and got into his van, shot the victim, and fled on foot. Howell further told the police that he threw the gun used to shoot the victim — a .357 revolver — behind a business called Southwestern Frozen Foods. The police subsequently recovered the gun next to a ball cap matching the description of the one worn by Howell at the time of the shooting. Police also located a bicycle a short distance from the victim's residence that Howell said he used to get back to the victim's residence after leaving in a vehicle with another person a short time before.

██ ██ There was testimony at trial that conflicted as to which direction the victim's assailant ran after firing a single shot into the van. This court has declared it well-settled that the credibility of witnesses is an issue for the fact-finder and not the reviewing court. *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (1989). The jury may resolve questions of conflicting testimony and inconsistent evidence and choose to believe the State's account of the facts rather than the defendant's. *Ross, supra.* The testimony at trial of the witnesses to the shooting, as well as Howell's confession, was clearly adequate to satisfy the substantial-evidence requirement. Therefore, the trial court's ruling was correct, and Howell's argument fails.

## Probable Cause to Arrest

■ ■ Howell also appeals stating that the trial court erred in finding there was probable cause to arrest him and not suppressing the fruits of that arrest. Probable cause exists where there is a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious person to believe that a crime has been committed by the person suspected. *Ross v. State*, 300 Ark. 369, 779 S.W.2d 161 (1989). The degree of proof sufficient to sustain a conviction is not required for probable cause to arrest. *Id.* All presumptions are favorable to the trial court's ruling on the legality of the arrest, and the burden of demonstrating error rests on the appellant. *Id.*

■ ■ However, mere suspicion is not enough to support a finding of probable cause to arrest. *Roderick v. State*, 288 Ark. 360, 705 S.W.2d 433 (1986), citing *Beck v. Ohio*, 379 U.S. 89, 85 S. Ct. 223, (1964). Probable cause to arrest without a warrant exists when facts and circumstances within the officers collective knowledge and of which they have reasonable trustworthy information are sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been committed by the person to be arrested. *Roderick, supra.*

Howell's challenge to the existence of probable cause to arrest came within his motion to suppress the statement that he gave after his arrest. However, the following facts that were testified to at trial support a finding of probable cause to arrest Howell. Officer Jimmy Courtney testified that he was dispatched to a residence located at 700 North Graham in response to a call that there had been a shooting at that address. Upon arriving on the scene, Officer Courtney made contact with two females and a male who identified himself as "Hightower" who told him that he had observed a black male wearing all black who ran from the residence after the victim, Darryl Allen, Sr., had been shot at close range while sitting in his van. Hightower identified the man who fled the scene as one known to him as "Donte." Officer Courtney said that Detective Muldrew and Lieutenant Burrus of the Hope Police Department subsequently arrived on the scene and talked to several witnesses.

Lieutenant Mike Burrus testified at trial that he participated in the investigation surrounding the death of Darryl Allen, Sr. Burrus said that he went to the scene and interviewed Lamario Hightower who told him that he knew the shooter as "Donte," a person Burrus knew lived on the south side of town. Lamario Hightower testified at trial that he had seen Howell at the victim's house approximately fifteen to twenty minutes before the shooting when Howell and the victim were arguing. Hightower said that Howell was dressed in black and that, after the argument, Donte left in a vehicle. Hightower described how Howell reappeared immediately after the shooting and then fled the scene.

Pursuant to that information received at the scene, Lieutenant Burrus requested that a patrol officer be dispatched to the residence of Howell's mother at eleventh and Edgewood streets to await Howell's return. Officer Jami Yarborough, a patrol officer with the Hope Police Department, testified that she went to the above-mentioned residence to await the return of Howell. While there, Yarborough testified that she observed an individual watching her from a wooded area near the residence. Yarborough said that she radioed this information to the police headquarters and other units where dispatched to assist her. She further testified that as she approached Howell, he fled into the nearby woods. Howell was subsequently taken into custody there by Sergeant Jim Bush and identified as Donte Howell. At trial, Yarborough testified that she noted that Howell was wearing black pants when he was arrested. The clothing worn by Howell matched the description given by witnesses at the scene of the shooting and was subsequently admitted into evidence.

▆▆▆ Howell was identified by name as the person who argued with the victim, left, and was then later seen fleeing the scene immediately after the victim had been fatally shot. When confronted by the police a short time later, Howell attempted to evade the police. Flight from the police is a circumstance to be considered in a determination of probable cause to support a warrantless arrest. *Smith v. State,* 343 Ark. 552, 39 S.W.3d 739 (2001). Based on the foregoing facts and circumstances, the police had probable cause to arrest Howell for the shooting of Darryl Allen, Sr.

Howell argues to this Court that based on the testimony entered by the State as to what the collective knowledge was at the time of Howell's arrest, the State failed to meet its burden of proof. Howell asserts that probable cause did not exist at the time of arrest, and therefore, Howell's arrest was illegal and any statements obtained after that illegal arrest are tainted and inadmissible.

■ However, the police had more than mere suspicion to support a finding of probable cause to arrest in this case. The facts and circumstances within the police officers' collective knowledge authorized a reasonable police officer to believe that an offense was committed by Howell. There were witnesses to the incident that described a black male, wearing black, who was known as "Donte" fleeing the scene of the crime. Further, Howell fled into nearby woods when the police approached him. Given this collective knowledge, there was probable cause to arrest Howell.

### Motion to Suppress Custodial Statement

■ ■ Howell's next point on appeal is that the trial court erred in refusing to suppress his confession to the police. When reviewing a trial court's ruling on a motion to suppress, this court makes an independent determination based on the totality of the circumstances and reviews the evidence in light most favorable to the appellee. *Wright v. State,* 335 Ark. 395, 983 S.W.2d 397 (1998). This court reverses only if a trial court's ruling on a motion to suppress is clearly erroneous. *Phillips v. State,* 321 Ark. 160, 900 S.W.2d 526 (1995). Upon appellate review, this court will make an independent review of the "totality of the circumstances" to determine whether the defendant's statement was made knowingly, intelligently, and voluntarily. *Bowen v. State,* 322 Ark. 483, 911 S.W.2d 555 (1995).

■ In *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1996), the United States Supreme Court recognized that custodial interrogations produce "compelling pressures which work to undermine the individual's will to resist and compel him to speak where he would not otherwise do so freely." A suspect's waiver of rights is valid only if it is made "voluntarily, knowingly, and

intelligently." *Burin v. State,* 298 Ark. 611, 770 S.W.2d 125 (1989).

■ There are two dimensions to the inquiry of waiver. *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135 (1986). First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Moran, supra.* Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances" surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may the court properly conclude that the *Miranda* rights have been waived. *Moran, supra.*

■ ■ This court reviews the totality of the circumstances surrounding the taking of a statement and determines whether an accused knowingly and intelligently waived his rights and will reverse only if the trial court's finding was clearly erroneous or against a preponderance of the evidence. *Lowe v. State,* 309 Ark. 463, 830 S.W.2d 864 (1992). There is no requirement that *Miranda* warnings be repeated each time a suspect is questioned. *Bryant v. State,* 314 Ark. 130, 862 S.W.2d 215 (1993). Under these standards, the trial court's denial of Howell's motion to suppress is affirmed.

■ ■ In determining whether a confession was voluntary, this Court considers the following factors: age, education, and intelligence of the accused, lack of advice of his constitutional rights, length of detention, the repeated and prolonged nature of the questioning, or the use of physical punishment. *Jones v. State,* 344 Ark. 682, 42 S.W.3d 536 (2001). It must be demonstrated that the activity of the police had a particular effect upon the accused. As the Supreme Court of the United States stated in *Colorado v. Connelly,* 479 U.S. 157 (1986), there must be an "essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other." Thus, courts cannot speculate as to "a defendant's motivation for speaking or acting as he did without some sort of indication from the defendant himself." *Connelly, supra.* The nexus between any

conduct of the police, coercive or otherwise, and the statement given by the accused, must be established to consider the remedies that flow from the *Miranda* warnings. The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired. *Hill v. State*, 344 Ark. 216, 40 S.W.3d 751 (2001). Moreover, voluntariness is not "to be equated with the absolute absence of intimidation," for under this test virtually no statement would be voluntary. *United States v. Pelton*, 835 F.2d 1067 (4th Cir. 1987).

 Here, the only suggestion of coercive police behavior is Howell's disputed assertion that he was told "what might happen" to someone charged with capital murder. Detective David Muldrew testified that he administered the rights form to Howell following Howell's arrest. Muldrew said that he read the waiver of rights aloud to Howell who then signed the form indicating that he was willing to talk to the police. Muldrew testified that Howell appeared to understand the form and his rights, and that he was not under the influence of drugs and/or alcohol. An additional aspect of Howell's detention was clarified by testimony at trial, which this court may rely on to affirm the suppression ruling. *See Hignite v. State*, 265 Ark. 866, 581 S.W.2d 552 (1979) (in reviewing the voluntariness of a statement or confession the court makes an independent determination based upon a consideration of the entire record.)

Muldrew testified that he saw Howell on two occasions before Howell confessed: following his arrest and the next morning. Muldrew stated that the total time involved in these two contacts was a total of no more than approximately twenty to twenty-five minutes. The State asserts that at no time was there any indication that Howell was subjected to any kind of "third degree" or techniques designed to overcome his own will. Moreover, the State contends that the only other "coercive" tactic alleged by Howell was that the telephone in his cell was turned off. However, there was also testimony that indicated that arrestees within the detention facility were not allowed outgoing calls when an investigation was ongoing.

Muldrew also testified that Howell's mother came down to the station on Sunday morning, but Howell never indicated that he wanted to speak to his mother. However, the two did speak. Howell did not assert at the suppression hearing that he had ever requested an attorney. This court held in *Miller v. State*, 338 Ark. 445, 994 S.W.2d 476 (1999), that the right granted in Ark. Code Ann. § 9-27-317(g)(2)(A)(ii) (Repl. 1998), which requires the police to honor a juvenile's request to speak with a parent, is a statutory right and not one conferred by the United States Constitution. As such, officers are not required to inform youthful suspects of that right as part of the *Miranda* warnings. The fact that Howell's mother was not present for Howell's waiver of rights might be a factor with regard to determining voluntariness. However, when a person under the age of eighteen is charged as an adult in circuit court, the failure to obtain a parent's signature on a waiver form does not render a confession inadmissible. *Misskelley v. State*, 323 Ark. 449, 915 S.W.2d 702 (1996).

Howell called Dr. Michael McAllister as a witness on the suppression issue. Dr. McAllister testified that Howell had an IQ of 62 (which is three levels below average for his age) and diagnosed him as mildly mentally retarded. He also testified that such an individual would have poor forethought and judgment. McAllister went on to say that he found Howell competent to stand trial and that he understood the criminality of his conduct. However, McAllister did state that a person functioning at Howell's level would have trouble adequately comprehending or asserting their legal rights or understand the principles of legal protection underlying the warnings of law enforcement officers, depending on how it is worded.

Also, Howell contends that he was prevented from calling anyone, even his mother. Howell was kept from contact with his mother for several hours until Sunday morning after two or three interrogations. Howell asserts that he was told, on more than one occasion, that he would be strapped to a gurney and they would shoot him with a needle and he would die. Eventually, Howell asserts after eighteen hours of isolation, not being able to call out of his cell on the phone, being kept from his mother and refused a private conversation with his mother, and allegedly being told that

he would be strapped to a gurney and injected with a needle, Howell claims he was finally coerced into giving the statement admitting he shot Darryl Allen, Sr.

Howell also suggests that he had been drinking heavily prior to his arrest, and the State asserts that this characterization is overstated and disputed. Howell stated in his confession that he had consumed quantities of alcohol before being arrested, but at the suppression hearing Howell testified that he had been drinking "gin and juice" with another person "a couple of hours" before he was arrested along with a "pint of vodka." Detective Burrus testified at the suppression hearing that he came into contact with Howell when he was first interviewed, and that Howell was calm and did not appear intoxicated nor did he exhibit other characteristics liked slurred speech. Burrus also stated that Howell appeared the same during the course of the next day after being held overnight in the detention facility.

The evaluation of the credibility of witnesses who testify at a suppression hearing about the circumstances surrounding an appellant's custodial confession is for the trial judge to determine, and this court defers to the position of the trial judge in matters of credibility. *Wright v. State,* 335 Ark. 395, 983 S.W.2d 397 (1998). Conflicts in the testimony are for the trial judge to resolve, and the judge is not required to believe the testimony of any witness, especially that of the accused since he or she is the person most interested in the outcome of the proceedings. *Wright, supra.* So long as there is no evidence of coercion, a statement made voluntarily may be admissible against the accused. *Wright, supra.*

Howell argues that the trial court erred in failing to grant his motion to suppress as Howell's custodial statement was not knowingly, intelligently, and voluntarily given. Howell asserts that his custodial statement is presumed involuntary and the burden is on the State to prove that his statement is voluntarily given.

Howell asserts that he is a seventeen-year-old, mildly mentally retarded youth who reads at a second-grade level. Howell was arrested on April 29, 2000, at approximately 10:50 p.m., and was taken to the police station and held in isolation until approxi-

mately 11:56 p.m. when Detective Muldrew read a *Miranda* rights form to him. Muldrew did not inquire as to Howell's educational or mental background. During this first interview, Howell denied any knowledge of the shooting, and was then returned to isolation and was again interrogated sometime early Sunday morning. Muldrew testified that the second interview was seven to eight hours after that first interview, but another Detective testified the second interview was held only thirty minutes after the first interview. At that time he was not given his *Miranda* rights again but was simply told that his rights were still in effect. Again, Howell denied any involvement in the incident.

A third interview was held sometime on that Sunday and Howell was again not read his *Miranda* rights but told he was under his same rights as read the day before. Only after a fourth interrogation, some eighteen hours after his arrest, did Howell give a statement about his involvement in the shooting. Under these circumstances, Howell argues that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights and give his statement. As such, Howell contends his statement should have been suppressed, as well as the gun which was recovered as a result of Howell's statement.

In the instant case, the trial court did not err in denying Howell's motion to suppress based on the totality of the circumstances. Howell was read the *Miranda* rights and signed the form indicating that he was willing to talk to the police. Howell's own witness, Dr. McAllister, testified that he was competent to stand trial and that he understood the criminality of his conduct. The credibility of witnesses who testify at suppression hearings is for the trial court to determine. Further, Howell was allowed to see and speak with his mother, even though he did not request such a visit. Here, it cannot be shown that the trial judge abused his discretion in finding that Howell's statement was given knowingly, intelligently, and voluntarily. Based on the totality of the circumstances, the trial court's denial of the motion to suppress was not clearly erroneous.

*Rule 4-3(h) Compliance*

The record has been reviewed for prejudicial error pursuant to Ark. Sup. Ct. R. 4-3-(h), and no reversible errors are found.

Affirmed.