2010 Ark. App. 238

**Dwayne WALLIS, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 09–612.**

Court of Appeals of Arkansas.

March 10, 2010.

Charles D. Hancock, Hancock, Lane, & Barrett, PLLC, Little Rock, for appellant.

Christian Harris, Assistant Attorney General, for appellee.

DAVID M. GLOVER, Judge.

Appellant, Dwayne Wallis, was convicted by a Lonoke County jury of rape and sexual assault in the second degree. He was sentenced to seventeen years' imprisonment on the rape conviction and ten years' imprisonment on the sexual-assault conviction, with the sentences to run consecutively. On appeal, Wallis argues that the trial court erred in not suppressing the statement he gave while in custody because it was involuntary; that the trial court abused its discretion in not granting his request for a bill of particulars; and that the trial court abused its discretion in running his sentences consecutively instead of concurrently. We affirm on the first two issues, but we remand for re-sentencing.

Wallis does not appeal the sufficiency of the evidence to support the convictions; therefore, only a brief overview of the underlying testimony is necessary. The victim in this case was Wallis's step-granddaughter, who testified that from the time she was eleven until she was almost thirteen, Wallis sexually abused her by touching her breasts and genitals, performing oral sex on her, digitally penetrating her vagina with his fingers, and, on one occasion, penetrating her vagina with his penis. Wallis denied these accusations.

### Voluntariness of Written Statement

Prior to trial, Wallis filed a motion to suppress the written statement he gave to the Lonoke County Sheriffs Department; this motion was denied. On appeal, Wallis argues that his written statement was not voluntarily given and should have been suppressed because (1) he was not given food or his medications prior to his alleged confession; (2) he has a borderline IQ of 79 and lacked experience in the legal process, which combined to contribute to his inability to comprehend what he was saying or doing; and (3) the time frame in which the interrogation was performed and the statement was given, totaling approximately ten minutes, was "questionably short considering the amount of information that was allegedly relayed." We affirm on this point.

In *Wright v. State*, 335 Ark. 395, 407–08, 983 S.W.2d 397, 403 (1998) (citing *Davis v. State*, 330 Ark. 76, 83–84, 953 S.W.2d 559, 562–63 (1997)) (internal citations omitted), our supreme court set forth the law regarding the voluntariness of a confession:

> A custodial confession is presumptively involuntary and the burden is on the State to show that the waiver and confession was voluntarily made. In examining the voluntariness of confessions, this court makes an independent determination based on the totality of the circumstances, and reverses the trial court only if its decision was clearly

erroneous. . . . [T]he inquiry into the validity of the defendant's waiver has two separate components: whether the waiver was voluntary, and whether the waiver was knowingly and intelligently made. In determining voluntariness, we consider the ₃following factors: age, education, and intelligence of the accused, lack of advice as to his constitutional rights, length of detention, the repeated and prolonged nature of the questioning, or the use of physical punishment. Other relevant factors in considering the totality of the circumstances include the statements made by the interrogating officer and the vulnerability of the defendant. In addition, the accused must have a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it in order for his waiver to be knowingly and intelligently made.

When there is conflicting testimony on the circumstances surrounding the taking of a custodial confession, it is the trial court's province to weigh the evidence and resolve the credibility of the witnesses. *Id.*

Wallis was arrested in Izard County on March 3, 2008, and was then transported to Lonoke County. At the suppression hearing, Deputy Michelle Stracener of the Lonoke County Sheriffs Office testified that she took a statement from Wallis on March 4, 2008; that Wallis was in custody at the time the statement was given; that prior to taking the statement, she advised Wallis of his rights by reading them to him; and that Wallis read the statement-of-rights form, initialed it, and signed it. Deputy Stracener stated that she did not notice anything about Wallis mentally that would cause her to think that he did not understand his rights; that he made no complaints to her about any physical problems or any other type of problems; that he did not refuse to cooperate after his rights were read to him; and that Wallis

was not coerced or intimidated into signing the rights form. Deputy Stracener testified that she read Wallis his rights around 8:50 a.m., and that it was a very short interrogation because Wallis made his statement at 9:00 a.m. She said that after Wallis signed the rights form, they had a discussion about the allegations, that the discussion was voluntary, that she asked Wallis ₄if he would write a statement, and that he agreed to do so. She said that she did not force Wallis to write the statement; that Wallis wrote the statement himself; that he did not seem to have any trouble writing the information on the form or understanding where to put the information on the form; and that she did not correct his spelling or change his writing in any way, although she did ask what certain words were because she did not understand them as he had spelled them. The form for the written statement asked for the name of the person making the statement, as well as his address, telephone numbers, date of birth, and social security number, all of which Wallis provided. The entirety of Wallis's written statement was

> Stacy Bailey came to me for comfort she was cousis about sex she want to kiss she let me touch her breasts several time she wanted me to touch her vagina several time we tried intercourse but it would go in and I stopped.

> 4345 Hwy 236W Lonoke

> Stacey would come to my camper

Deputy Stracener stated that Wallis's written statement was consistent with the conversation they had prior to Wallis making his written statement.

On cross-examination, Deputy Stracener testified that she thought that at all times during the investigation Wallis understood what was going on and was in his right mind, that he never asked to stop and did

not complain of any physical or mental problems, and that he was neither forced to make a statement nor promised anything in return for giving his statement. She said that she had no dealings with Wallis prior to 8:50 a.m. on March 4, 2008, when she brought him in and advised him of his rights, and she did not know whether Wallis had eaten anything from 11:30 p.m. on March 3, 2008, until she talked with him the next morning. She acknowledged that the intake form indicated that Wallis had some medical conditions such as COPD, high blood pressure, and problems with his back, and she noted that there were no medications listed as having been administered to Wallis. She stated that she did not think it was important to ask a person about his medical condition before taking a statement, and that if the person appeared to be fine, she would take the statement. She said that had she noticed something that would have caused her to believe Wallis was lacking his medication or was unable to cooperate with her, she would not have interviewed him.

Shawnette Kimble, Wallis's son's girlfriend, testified that she took Wallis's medication to the Melbourne Police Department and told an officer about Wallis's medication regimen in detail, but she did not know if the officer took Wallis's medication to him or not. She said that Wallis was on heart, diabetes, "mental," thyroid, and blood-pressure medications. She said that she did not know if Wallis took his medications on the night of March 3. She stated that she did not see Wallis again until March 4; that he was pale and seemed depressed and confused about what was going on; and that he did not seem to understand much. Kimble testified that when they took Wallis to get some fast food, he began complaining of chest pain and coughing a lot, and that they took him to the emergency room, where he was given antibiotics and an inhaler.

On cross-examination, Kimble reiterated that she did not know if Wallis had taken his medication on March 3; that when she saw him on March 4 he seemed confused, pale, and depressed, and that he did not seem to know "what was going on very well." However, she also stated that part of Wallis's medical problems were that he had a bad memory and did not remember a lot of things.

Joyce Wallis, Wallis's sister-in-law, testified that when Wallis was bonded out of jail, he looked pale and disoriented, and that he said he had not eaten anything and did not get his medication.

Dr. Paul Deyoub, a forensic psychologist, testified that upon examination, he found Wallis to have a full scale IQ of 79, with a verbal IQ of 83 and a performance IQ of 79, which was in the borderline or low-average range. Dr. Deyoub said that someone with Wallis's IQ would be a more concrete thinker with an unskilled work history, but that he would be able to negotiate daily life.

John Barta, a jailer at the Lonoke County Sheriff's Department, testified that the jail kitchen usually closed about 7 p.m., but if people were brought in after that time and requested food, food would be provided for them. He said that he did not have a record of providing any food to Wallis on the night of March 3, but that he would have been given food at 6 a.m. Barta also testified that it was noted that Wallis was offered a snack at 10 a.m. because he was diabetic, but that he refused it. Barta said that there was no record of Wallis having any insulin with him, that it would be impossible for him to have administered insulin if none was there, and that he was not aware that Wallis had received any insulin while in his custody. After hearing the testimony, the trial court ruled that

Wallis's statement was knowingly and voluntarily made.

Wallis first argues that his written confession was not voluntarily given because he had not received his medication or food prior to his alleged confession. However, the testimony at the suppression hearing was conflicting. Deputy Stracener testified that Wallis made no complaints about his physical or mental health, and that he seemed to be fine or she would not have interviewed him. She said that he seemed to understand his rights, voluntarily initialed and signed the rights form, and voluntarily provided her with a written statement. Although Wallis's family testified that he seemed pale, confused, and unaware of what was going on when he was released from jail on the afternoon of March 4, the trial court, as the one who makes determinations regarding witness credibility, was not required to believe that testimony.

Wallis next argues that because of his "borderline" IQ, he was unable to comprehend the legal process and his rights associated with the legal process. A low intelligence quotient, in itself, will not render a waiver of the Fifth Amendment privilege against self-incrimination involuntary; other factors to be considered are the defendant's age, experience, education, background, and length of detention. *Burin v. State*, 298 Ark. 611, 770 S.W.2d 125 (1989). Here, while Dr. Deyoub testified that Wallis's IQ of 79 was borderline low-average, he also testified that a person with that IQ could function in daily life and make adaptations. Wallis was fifty-four years old and disabled at the time he gave his statement. However, he was not interrogated for a lengthy period of time—testimony indicated that the interrogation, including the time it took Wallis to write his statement, was approximately ten minutes.

Wallis also argues that the short amount of time it took to sign the waiver and write out a confession indicates that his statement was not voluntary. He points to the fact that the written confession had several misspelled words and did not flow coherently, combined with the lack of food and low IQ, as indicators that the written statement was not voluntarily given. However, these factors do not militate against the voluntariness of the written statement. There was testimony that Wallis was served breakfast on the morning of March 4 prior to giving his written statement. The misspellings in the statement are not surprising, as Wallis had an IQ of 79. Furthermore, Wallis was not interrogated for a long period of time; in fact, from the time he was read his rights to the time he wrote his statement was only approximately ten minutes. Looking at the totality of the circumstances in this case, we cannot say that the trial court's finding that Wallis's statement was voluntarily, intelligently, and knowingly made was clearly erroneous.

## Bill of Particulars

Wallis filed a motion for bill of particulars requesting "as specific as possible a date for the alleged act or acts, either by reference to the calendar or by reference to other events." The trial court denied this request, and Wallis now contends that this was an abuse of discretion, arguing that he was denied a fair trial and due process because he was not provided with a bill of particulars setting forth the time and circumstances of the alleged criminal offenses. He argues that had the State been able to identify specific dates that criminal activity was alleged to have occurred, he would have been better able to prepare a defense or possibly provide an alibi as to his whereabouts on that date.

The purpose of a bill of particulars is to inform a defendant of the charge in sufficient detail to prepare a defense. Ark.Code Ann. § 16–85–301(a) (Repl.2005). The trial court, in its discretion, can grant or deny the request for a bill of particulars. *Burnett v. State,* 287 Ark. 158, 697 S.W.2d 95 (1985). "A bill of particulars as to the precise time the offense was committed need not be granted unless the time is material to the allegation." *Johnson v. State,* 292 Ark. 632, 645, 732 S.W.2d 817, 824 (1987). The State was not required to prove specifically when each act of rape or sexual contact occurred, as time is not an essential element of the crimes. *Rains v. State,* 329 Ark. 607, 953 S.W.2d 48 (1997). Young victims of sexual abuse can rarely provide the exact time an offense occurred, and any discrepancies in testimony with regard to the date of the offense are for the jury to resolve. *Id.* The trial court did not abuse its discretion in this matter.

### Sentencing

Wallis argues that the trial court erred in running his sentences consecutively instead of concurrently because the decision was based upon what the trial court believed the jury wanted to be done. We hold that this argument is meritorious and remand to the trial court for re-sentencing.

Arkansas Code Annotated section 5–4–403(a) (Repl.2006) provides, "When multiple sentences of imprisonment are imposed on a defendant convicted of more than one (1) offense, ... the sentences shall run concurrently unless, upon recommendation of the jury or the court's own motion, the court orders the sentences to run consecutively." The trial court is not bound by the jury's recommendation with regard to a sentencing option. Ark.Code Ann. § 5–4–403(d). Whether sentences should be run consecutively or concurrently is within the sole discretion of the trial court, and exercise of that discretion will not be reversed on appeal unless there is an abuse of that discretion; it is a heavy burden to prove that a trial court did not exercise its discretion in determining whether to run sentences consecutively. *Throneberry v. State,* 2009 Ark. 507, 342 S.W.3d 269.

We hold that in this case the trial court failed to exercise its discretion. There was no recommendation from the jury regarding whether to run the sentences concurrently or consecutively. After hearing the State's argument to impose consecutive sentences and the defense's argument to impose concurrent sentences, the trial court stated that it was going to run the sentences consecutively. Defense counsel then asked the trial court to articulate its reasons for running the sentences consecutively. The trial court responded that the jury had sentenced Wallis to seventeen years for rape and ten years for second-degree sexual assault, and that generally, if the jury had intended anything else, it thought that the jury would have set both sentences at ten years.

In *Wing v. State,* 14 Ark.App. 190, 686 S.W.2d 452 (1985), this court held that a trial court had failed to exercise its discretion in sentencing when it stated that it would impose consecutive multiple sentences instead of concurrent sentences, noting that had the jury wished otherwise, it would have noted otherwise. This court further held that the trial judge erroneously "attempted to implement what he perceived the jury wanted rather than to exercise his own discretion relative to the sentencing." 14 Ark.App. at 192, 686 S.W.2d at 454. Here, as in *Wing,* the trial court, as evidenced by its comments from the bench, implemented what it perceived to be the desire of the jury, when in fact the jury had made no recommendation. We therefore remand to the trial

court for re-sentencing, without implying in any way whether Wallis's sentences should run concurrently or consecutively. *Id.*

Affirmed in part; remanded in part.

ROBBINS and MARSHALL, JJ., agree.